A. J. WHITE & CO. and Allen J.
White, Petitioners,

v.

SECURITIES AND EXCHANGE
COMMISSION, Respondent.

No. 76–1420.

United States Court of Appeals,
First Circuit.

Argued March 8, 1977.

Decided June 15, 1977.

J. Joseph Nugent, Jr., Providence, R. I., with whom Nugent & Nugent, Providence, R. I., was on brief, for petitioners.

David Ferber, Sol. to the Commission, Washington, D. C., with whom Alan Rosenblat, Asst. Gen. Counsel, and Linda W. Jarett, Atty., Securities and Exchange Commission, Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

ALDRICH, Senior Circuit Judge.

This is a petition for review of an SEC order revoking the registration of A. J. White & Co. (White & Co.), a broker-dealer, and barring its president, Allen J. White (White), from association with any broker-dealer. The order provides that after one year White may apply for leave to become associated with a broker-dealer in a nonproprietary capacity under adequate supervision.[1] Petitioner White & Co. was found to have willfully violated the antifraud, extension of credit, and prospectus delivery provisions of the securities acts, and White to have willfully aided and abetted these violations, in connection with its underwriting of a stock issue of a company called Develco, Inc. According to the prospectus, the underwriting was to be on a "best efforts 65,000 shares or none" basis, that is, although White & Co. was not committed to

---

1. Sanctions were also imposed on two other individuals associated with White & Co., Noon and McDermott, but neither appealed from the administrative law judge's decision.

purchasing any amount of the offering, if it was unable to sell at least 65,000 shares within sixty business days all money received from subscribers was to be refunded and the offering cancelled. Basically, the Commission's contention is that White & Co. realized it would be unable to place the requisite number of shares, but rather than abort the offering, a scheme was devised to make it appear that the offering had been successful.

The facts, as found by the administrative law judge, and affirmed by the Commission, and for which we find substantial evidence in the record, are as follows. Sometime before the deadline for sale of the minimum amount, it became apparent that the offering was not going well. Indeed, the issuer's attorney had threatened White & Co. with suit for failure to use its best efforts. About a week before the deadline, only about one-half of the minimum having been sold, a meeting was held attended by White, Noon, the underwriting manager of White & Co., and the three principals of the issuer. White informed the Develco principals that the offering might have to be aborted. Although at that time approximately $90,000 remained to be raised, the administrative law judge found that White told the Develco principals that they were only about $20,000 short. Either White or Noon suggested that the Develco principals could borrow money from the Industrial National Bank of Rhode Island and make it available to persons who could use it to purchase stock. Noon left the meeting to call the bank and returned with the information that two of the Develco principals could each borrow about $9,000, and that they should see a Mr. Glover at the bank. They did so, took out loans, and provided the funds to two Develco employees who purchased stock on the understanding that it would be resold shortly to pay off the loans.

The remaining $70,000 was raised in a similar fashion. Noon and Glover arranged that various friends of Glover, collectively

referred to here as the "Warwick Jaycees," take out loans, with the funds to be used for stock purchases. The stock was purchased in the name of six customers of White & Co., two of them supplied by White. Within a short time after the closing, the stock purchased in this manner was resold to pay off the loans. The extent to which the six purported purchasers were informed about the transaction varied. In at least one instance, the customer testified that he knew nothing about the deal until after it was completed. In other cases, including one of White's customers, the individual was asked if he was interested in purchasing Develco stock and his consent was secured only on the understanding that he would not have to provide funds, and on White's assurance that he should not worry because the stock would be resold quickly.

■ Petitioners' factual contention, essentially, is that White "was not a party, even remotely, to the developments that led to the . . . loans to the Develco principals," and that he did not know that the remaining $70,000 was provided through loans from the Industrial Bank. Although it should hardly be necessary, we begin by noting that our question is only whether the Commission's findings are supported by substantial evidence, 15 U.S.C. § 78y(a)(4), and thus petitioners' statement that they "cannot agree" with certain of these findings, and their continued objection to the Commission's crediting some witnesses instead of others, based upon petitioners' assessment of the evidence, are entirely beside the point. As to the loans to the Develco principals, petitioners' contention does not meet even their own standard. Whether the loans were initially suggested by White or Noon, it is undisputed that White was present at the meeting, indeed he called it, and he heard and participated in the discussion. Moreover, he admitted that he "was in overall supervisory charge" of White & Co.'s operations, and "participate[d] with [Noon] in each underwriting." [2]

2. This was not a large firm, having about seventeen employees. Its underwriting operation was on a very small scale. White testified that the firm had engaged in only about six under-

writings in its history. There were no other underwritings in progress at the time of the Develco issue.

As the man in charge, he can hardly wash his hands of the affair merely because he allowed Noon to do the talking.

White's profession of ignorance concerning the other set of loans is more arguable, but we do not find the Commission's conclusions impermissible. While there was no direct evidence that White participated in these loans, it was clear that Noon did so, and the Commission's inference that White was fully aware of this was not improper. Aside from his close supervision of the firm, and Glover's testimony that he never doubted that White was aware of the loans, White's story that he believed that the money had been provided by the Warwick Jaycees as an investment club is not credible. White testified that the stock was placed in other accounts, rather than opening an account for the Warwick Jaycees, because he believed this would comport better with the "know your customer" rule, Rule 405 of the New York Stock Exchange. Whatever one may think of his understanding of that rule, his contention does not square with the facts.

To begin with, there is the fact that it was understood that the stock was to be resold quickly, as was done. If the Warwick Jaycees were actually putting up their own money as a bona fide investment, it is hard to see how White could be so confident that they would wish to resell the stock immediately. The most damaging evidence against White's contention is his admission that he received approximately $5,000 from the Warwick Jaycees after the stock was resold in the form of a reduction in the principal of a loan he had outstanding at the Industrial Bank. It is difficult to understand why any ordinary customer would wish to confer a large gift upon his broker, and even more difficult to see why the gift should happen to take the form of paying off a loan at that particular bank. Moreover, several of the nominees retained some portion of the resale profits—another bit of unexplained generosity on the part of the

Jaycees. On the other hand, the transactions are quite understandable on the assumption that White knew that the Jaycees were not bona fide customers who would, of course, expect to receive the full amount of the profits on the sale of their stock, but had merely allowed their names to be used on loans, with the profits on resale to be divided among the other participants.[3] Thus we conclude that the Commission's finding that White knowingly participated in the scheme is amply supported.

The Commission found that these transactions "materially altered the method of distribution" of the securities from that specified in the prospectus and that failure to disclose this alteration violated the anti-fraud provisions, Securities Act § 17(a), 15 U.S.C. § 77q(a); Exchange Act § 10(b), 15 U.S.C. § 78j(b); Rule 10b–5, 17 C.F.R. § 240.10b–5. For the same reasons, petitioners were found to have violated section 5 of the Securities Act, 15 U.S.C. § 77e. *See SEC v. Manor Nursing Centers, Inc.*, 2 Cir., 1972, 458 F.2d 1082. Petitioners attack these rulings principally on the ground of materiality.

The inclusion of an "all or none" or "some or none" provision in a best efforts underwriting may serve a number of purposes. Thus a corporation may need a certain minimum amount in order to carry out the enterprise for which funds are being raised. In such a case, if less than the minimum is raised, the corporation might not be able to carry out its plans effectively, and investors could suffer severe losses. Thus it would be a very serious violation of the representations of the issuer and underwriter to the subscribers to declare such an offering sold when the minimum amount had not been realized. See generally Rule 10b–9, 17 C.F.R. § 240.10b–9; *SEC v. Manor Nursing Centers*, ante. This is not such a case, however, for here the minimum amount of funds was received by the issuer.

---

**3.** Glover testified that he and Noon had agreed that of the loan proceeds only 90% would be used for the stock purchases, the balance to be divided among the debtor, Glover, and Noon.

■ Our question, therefore, is whether it matters significantly to investors that about one-half of the minimum amount was raised through short-term bank loans rather than bona fide sales to investors. We believe the Commission's conclusion that this, too, was a serious violation was well within its discretion. The knowledge that the minimum amount has been sold to bona fide investors may be a very important matter to the other investors. Particularly in cases such as this, an offering of shares in a new company, one of the investors' major concerns will be whether the price they are paying for the securities is a fair market price. The inability of the underwriter to sell the specified minimum to bona fide investors may well indicate that the market judges the offering price to be too high. Thus, to declare an offering completed through non-bona fide sales financed through bank loans, where the purported investors have not made an investment decision backed with their own money, may significantly mislead the legitimate investors as to a crucial factor in their decision.

Nor are the initial investors the only ones likely to be harmed. If the scheme employed by petitioners was to be successful, and the loans repaid, there had to be persons willing to purchase Develco stock after the offering at a price above, or at least equal to, the initial offering price. Such investors, too, would probably be influenced by the representation that the offering had been successful when deciding whether to purchase. Thus, petitioners' contention that "[n]o manipulation took place," and that no investors lost any money as a result of their actions, may well be shortsighted— many investors may have paid more for these securities than they would otherwise have done, or bought them when they would not otherwise have done so, with, incidentally, White receiving part of the profit.

In objecting to the Commission's view that disclosure of the change in the method of distribution was required, petitioners point to "the lateness of the hour," apparently suggesting that it was too late to advise subscribers of "these limited 'financ-

ing arrangements.'" Even if that is true, petitioners are not aided. If it was too late to disclose the change, the investors had a right to assume that the prospectus would be complied with, not changed.

■ Aside from the illegality of the ends, the means by which petitioners made it appear that the offering had been successful constituted clear violations of the securities acts. Under section 7(c) of the Exchange Act, 15 U.S.C. § 78g(c), it is illegal for a broker or dealer "directly or indirectly, to . . . arrange for the extension . . . of credit" for the purchase of securities in violation of the regulations of the Federal Reserve System. The Commission found petitioners to have violated this provision since the Federal Reserve regulations allow the extension of credit only on certain securities, and "[t]here is no indication that Develco securities were on the Board of Governors' list of eligible securities, and, given Develco's brief history, it is most unlikely." Petitioners contend that this amounted to an improper shifting of the burden of proof. It seems clear, however, that no substantial right of petitioners was prejudiced. Petitioners do not now contend that the Develco stock actually was an eligible security, a matter easily checked and undoubtedly within petitioners' knowledge. If they suffered, other than technically, they should have filed a motion for rehearing. In any event, even if these securities were eligible, these were 100% loans, far in excess of the Federal Reserve Board's margin requirements. Moreover, these were unsecured loans, and section 7(c)(2) of the Exchange Act, 15 U.S.C. § 78g(c)(2), flatly prohibits a broker or dealer from arranging for loans without collateral for the purchase of securities.

The transactions also violated section 11(d)(1) of the Exchange Act, 15 U.S.C. § 78k(d)(1), which prohibits broker-dealers who have participated in the sale of a new issue from extending or arranging for credit to a customer in connection with a transaction in that security within thirty days of their participation in the sale of the issue.

There is no dispute that the Develco offering was a new issue, and we cannot understand petitioners' argument that the thirty day provision was not violated—the credit was arranged for sales which were part of the initial offering. This is a clear instance of the sort of transaction intended to be barred by section 11(d)(1). As the legislative history makes clear: "This strikes at one of the greatest potential evils inherent in the combination of the broker and dealer function in the same person, by assuring that he will not induce his customers to buy on credit securities which he has undertaken to distribute to the public." H.R.Rep. No.1383, 73d Cong., 2d Sess. 22 (1934).

The Commission's finding that petitioners' activities amounted to "arranging" for credit is well warranted. As to the loans to the Develco principals, it is undisputed that this was suggested by either White or Noon, not by the customers. With White's knowledge, Noon called the bank, and reported back that the loans could be had. When the borrowers arrived at the bank they found the applications waiting for them. "[N]o detailed analysis is required to determine that an arranging is involved when the broker procures or negotiates financing for the customer by another." *Sutro Bros. & Co.*, 1963, 41 S.E.C. 443, 456. *See also Junger v. Hertz, Neumark & Warner*, 2 Cir., 1970, 426 F.2d 805, *cert. denied*, 400 U.S. 880, 91 S.Ct. 125, 27 L.Ed.2d 118. As to the other set of loans, if the nominees are to be considered the customers, then White is guilty of arranging credit on his own testimony that money supplied by the Jaycees was to be made available to them through the firm. Furthermore, as we have already noted, the Commission could properly find that White was fully aware that the firm, through Noon, was arranging for loans to the Jaycees.

■ Our discussion thus far implicitly disposes of petitioners' claim that they were not shown to have had the mental state necessary to justify the sanctions imposed. Whether we view this as a matter of scienter, which petitioners maintain is a substantive element of certain of the offenses charged, or as a matter of willfulness under section 15(b)(4)(D) of the Exchange Act, 15 U.S.C. § 78*o*(b)(4)(D), we think the Commission's order justified. Despite the clear representations in the prospectus, White and Noon chose not to refund the subscribers' funds, but to embark on a series of transactions designed to make it appear that the offering had been successful. They showed no regard whatsoever for the requirements of the credit extension provisions of the Exchange Act. A firm, such as petitioner White & Co., can act only through its agents, and is accountable for the actions of its responsible officers. *Armstrong, Jones & Co. v. SEC*, 6 Cir., 1970, 421 F.2d 359, *cert. denied*, 398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543. White's knowing participation in the scheme amply supports the Commission's finding that he willfully aided and abetted White & Co.'s violations. Nor do we find any "gross abuse of discretion" in the Commission's imposition of sanctions. *Lawrence v. SEC*, 1 Cir., 1968, 398 F.2d 276, 280. The Commission apparently regards conduct of the sort illustrated in this case as a serious breach of the underwriter's duty to investors, *see* SEC Release 34–11532, July 11, 1975, 2 Fed.Sec.L.Rep. (CCH) ¶ 22,-730, and we do not disagree with this judgment.

■ There remain a number of other matters raised by petitioners. We cannot agree with the contention that, as a matter of res judicata, or discretion, the Commission may not institute administrative proceedings after referring the matter for criminal prosecution, as was done in this case. Both the issues and the purposes of the two types of proceedings are different. Indeed, the statutory provision governing administrative proceedings against broker-dealers refutes petitioners' contention, for one of the grounds for sanctions is conviction of a criminal offense involving the sale of securities. 15 U.S.C. § 78*o*(b)(4)(B). Nor are we persuaded by the argument that it was improper for the Commission to decline to accept petitioners' settlement offers or attempts to voluntarily withdraw their registration. *See Guaranty Underwriters, Inc.*

*v. Johnson*, S.D.Fla., 1942, 2 S.E.C.Jud.Dec. 719, *aff'd*, 5 Cir., 133 F.2d 54; *Fontaine v. SEC*, D.P.R., 1966, 259 F.Supp. 880. Litigants are never required to accept settlement offers, and the provision petitioners sought to invoke specifies that broker-dealers may withdraw only "upon such terms and conditions as the Commission deems necessary or appropriate in the public interest or for the protection of investors". 15 U.S.C. § 78*o*(b)(5). Petitioners contend that the Commission's order should be vacated because, after the initial decision of the administrative law judge, White was allowed to withdraw his guilty plea to the criminal charges which had been brought against him. The administrative law judge, however, explicitly stated that White's criminal conviction was not the basis for imposing sanctions, and made it clear throughout the hearings that he was not interested in the criminal proceedings. The Commission's opinion makes no mention at all of White's criminal prosecution. Nor do we find any error in the exclusion of a self-serving affidavit sought to be filed by one of the parties in lieu of his live testimony. Finally, we have examined the record with care and find no warrant for petitioners' claim that the administrative law judge was so biased against them as to amount to a denial of due process.

*The order is affirmed.*