SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

BLINDER, ROBINSON & CO., INC.;
Meyer Blinder; et al., Defendants.

Civ. A. No. 80–M–1125.

United States District Court,
D. Colorado.

June 8, 1982.

Rodney K. Vincent, Richard S. Vermiere, Robert Davenport, S.E.C., Denver, Colo., for S.E.C.

William Fishman, Marc Geman, Fishman & Geman, P.C., Donald T. Trinen, Denver, Colo., for Blinder, Robinson & Co., Inc. and Meyer Blinder.

MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

This is a civil enforcement action against Blinder, Robinson & Co., Inc. (Blinder-Robinson), a registered broker-dealer, and Meyer Blinder (Blinder), its president and principal shareholder. The plaintiff's allegations of violations of federal securities laws and regulations all concern offers to sell, sales and delivery after sales of a registered offering of 10 million units of common stock and warrants issued by American Leisure Corp. (American Leisure), a New Jersey corporation, which was a wholly-owned subsidiary of Beef & Bison Breeders, Inc. (BBB).

The SEC brought this action pursuant to Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b) (1976), and Section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d) (1976). This court has jurisdiction of the action under Section 22(a) of the 1933 Act, 15 U.S.C. § 77v(a) (1976), and Section 27 of the 1934 Act, 15 U.S.C. § 78aa (1976). Venue in this court is proper: Blinder-Robinson is located and does business within the State of Colorado, Blinder resides in the state, and many of the acts alleged in the SEC's complaint occurred within the state.

The complaint alleged violations of the anti-fraud provisions of both Securities Acts, Section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a) (1976), Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) (1976), and of Rules 10b–5, 6 and 9 promulgated thereunder, 17 C.F.R. §§ 240.10b–5, 6, 9 (1981); it also alleged violations of Section 15(c) of the 1934 Act, 15 U.S.C. § 78o(c) (1976), which prohibits fraudulent acts by brokers, and of Rule 15c2–4 promulgated thereunder, 17 C.F.R. § 240.15c2–4 (1981). The Commission seeks an injunction against future violations of these sections and rules.

In addition to Blinder-Robinson and Blinder, the SEC originally named the following corporations and individuals as defendants in this action: American Leisure, Cavanagh Communities Corp., Scope, Inc., Nathan S. Jacobson, Irwin S. Lampert, Joseph Klein, and Leon Joseph. These defendants all have entered into consent decrees with the SEC, and no longer are active parties in this litigation.

## FACTS

The offering was on a "best efforts, all or none basis." For a unit price of $2.50, the purchaser received one share of American Leisure common stock; one Class A Warrant (two of which entitled the holder to purchase one share of common stock for $3.50 on or before July 26, 1980); and one Class B Warrant (four of which entitled the holder to purchase one share of common stock for $7.00 on or before December 26, 1980). The offering was to be open for a period of 90 days from December 26, 1979, the effective date of the registration statement. A subscription offer of 2 million of the 10 million units was made to the shareholders of BBB. The proceeds from the offering and the exercise of the warrants were intended to be used for the construction and operation of a casino hotel in Atlantic City, New Jersey.

Blinder-Robinson was the underwriter for this offering and the underwriting agreement with American Leisure provided for the deposit of all monies collected from subscribers into a special account at Metro National Bank of Denver, Colorado (Metro Bank). It also required the refund of that money and termination of the offer if all of the units were not sold within 90 days from the effective date of the prospectus, or an additional 90 days if extended by mutual agreement between the issuer and the underwriter. The parties did not agree to extend the original deadline of March 25, 1980.

The prospectus made it clear that this offering was for an extremely speculative investment. Not only was American Leisure a new business without an operating history, it was unable to make any immediate use of the proceeds because it had only 1.72 acres of land in Atlantic City and that was insufficient for the development. The prospectus cautioned that American Leisure would have to acquire more land or obtain

the necessary variances and approvals to permit the use of its parcel. Accordingly, the prospectus provided that after the closing of the offering, the net proceeds, less deduction of underwriting costs, discounts, commissions and expenses, would be placed in a second escrow account with Metro Bank, as escrow agent, to hold the proceeds for a period not exceeding one year, during which no more than $1 million could be released for certain limited purposes.

Irwin Lampert, an attorney, has had a close personal relationship with Meyer Blinder since they met in Florida in 1972. Mr. Lampert was counsel for Blinder and Blinder-Robinson in an earlier securities case. Mr. Lampert has been president of BBB since its inception in 1976, and Blinder-Robinson did a small underwriting of one-half million dollars when that company went public. When BBB acquired American Leisure, Irwin Lampert became secretary-treasurer of that company and asked Meyer Blinder to do the underwriting of the securities to obtain the money for the casino hotel development. Meyer Blinder suggested a larger issue than was originally contemplated and recommended the use of warrants to obtain additional funds as the work progressed. He also recommended the employment of Nathan Jacobson as president because of his experience with gambling casinos in Nevada. That was accomplished and Mr. Jacobson, Mr. Lampert and Mr. Blinder met frequently in early 1979 to discuss this project.

The law firm of Friedman and Shaftan, P.C., of New York, New York, was retained as counsel for American Leisure in the offering and the Denver law firm of Brenman, Epstein and Zerobnick, P.C., represented the underwriter. That firm had frequently been counsel for Blinder-Robinson in other underwritings. Because of some difficulties in communicating with the SEC, American Leisure also retained Bernard Feuerstein, a New York lawyer, to assist with the registration. That was pursuant to the recommendation of Meyer Blinder.

The Blinder-Robinson sales force was very enthusiastic about the American Leisure offering. Most of them were quite young (under 30), inexperienced, aggressive and uninhibited. They talked up the American Leisure opportunity with their regular customers before the prospectus became effective and sales were brisk in January and February, 1980. It was common practice for the sales representatives to say that the American Leisure securities would open at a premium in the after-market and some suggested that $5.00 or more could be expected as the opening price. The evidence supports a finding that an established sales practice was to suggest that Blinder-Robinson people had inside information about pending developments which would make the stock increase in price, and this finding is buttressed by the convenient lapse of memory of sales representatives called as witnesses in this trial.

Much of what the sales representatives said was generated at a sales managers' meeting held in Florida in January, 1980. At that time, Meyer Blinder told the managers that negotiations were proceeding for American Leisure to obtain additional land in Atlantic City and that there would be a public announcement when the deal was made. The managers relayed the same message to the sales representatives who incorporated it in their presentations.

At the time of that meeting, Blinder knew of talks between Irwin Lampert and Joseph Klein, chairman of the board of Cavanagh Communities Corp. (Cavanagh), a company which had a contract to purchase 8.4 acres of land in Atlantic City, near the American Leisure site. Meyer Blinder had participated in those conversations in 1979. After Cavanagh acquired the land, Jacobson talked further with Klein who said there would be an interest in some arrangement if the American Leisure offering succeeded.

In January, 1980, Mr. Jacobson reported to Mr. Klein that the offering was going quite well, and Mr. Klein replied that he couldn't negotiate then because of a pending deal with another company which would or would not be made by February 15. That deal was not made and Lampert then

called Klein and said that $19 million of the offering had been sold, but another market-maker was needed for the final $6 million. Joseph Klein recommended Elkins and Co. (Elkins) which agreed to sell $5 million worth of American Leisure units, but then reduced its participation to $2½ million on legal advice that it should not take more than 10% of the issue.

Mr. Sgarlet of Elkins also was involved with Cavanagh and that involvement generated legal concerns for Elkins if an agreement were to be made between Cavanagh and American Leisure. Accordingly, on March 5, 1980, Mr. Nagy of Elkins called Mr. Padgett, vice-president of Blinder-Robinson, to read a draft of a letter advising purchasers and prospective purchasers of the American Leisure securities that there was no agreement between Cavanagh and American Leisure. Mr. Padgett refused to approve that letter because there was still hope for such an agreement. The result was the withdrawal of Elkins and the cancellation of many of its sales. Other cancellations also were coming through in early March.

It had been expected that the American Leisure offering would be completed and sold out during the week beginning Monday, March 17, 1980. Accordingly, the principal persons involved came to Denver to prepare for a closing during that week.

Recognizing a possibility that the issue would not be sold out, Meyer Blinder had asked Bernard Feuerstein to find out if an underwriter could purchase the securities in a "best efforts, all or nothing" offering, and Mr. Feuerstein called John Della Grotta, a young lawyer at the Washington, D.C. office of the SEC, about March 10, to ask the narrow question of whether there was an absolute restriction or a special rule prohibiting that possibility. Mr. Della Grotta replied that there was none. Mr. Feuerstein advised Mr. Blinder of that answer. Mr. Feuerstein also talked with the National Association of Security Dealers (NASD) on the same subject and received that same answer with the caveat that there would be concern if the underwriter sold the shares at a premium in the aftermarket.

What had been a possibility soon became a probability during the week of March 17 and there were further discussions by the involved lawyers concerning the purchase of a large block of the securities by Blinder-Robinson. Of particular concern was whether that purchase would be a material development which should be disclosed by a supplement to the prospectus, commonly called a "sticker." One sticker had already been placed on the prospectus because of a development concerning the subscription offer to the BBB shareholders.

While the evidence is conflicting, the more probable and credible testimony is that Bernard Feuerstein, Gerald Raskin of the Brenman firm, and Mr. Brenman as well, all concluded and advised both Blinder and Padgett that such a sticker would be necessary. When questioned concerning the basis of their advice, both Raskin and Brenman said that it was because the warrants imposed a continuing obligation on the issuer to disclose material developments, even after the closing date. That advice, which had been communicated by March 20, 1980, was rejected as a "business decision" by Meyer Blinder and others at Blinder-Robinson. Part of the rationalization for that rejection was that a sticker was seen as futile since more copies of the prospectus would not be delivered, and because it would damage Blinder-Robinson's reputation in the industry if it became known that it could not sell out an offering.

By Wednesday, March 19, 1980, it became apparent that the offering would not be sold out by the deadline of March 25, 1980. Irwin Lampert flew to Miami, Florida, to meet with Joseph Klein and he, in turn, introduced Leon Joseph, a former Cavanagh employee who was the principal of a company called Scope, Inc. (Scope). That company had substantial cash and was negotiating with Klein about the possibility of buying the equity in Perdido Bay Country Club Estates, a real estate development which was in foreclosure. Scope had a good banking relationship with Great American Bank of Dade County, Florida (Great American),

and had purchased certificates of deposit from that bank.

On Friday, March 21, 1980, Joseph Klein, his father Zola Klein, and Irwin Lampert met with Leon Joseph about the possible purchase by Scope of 600,000 American Leisure units. They went to the Great American Bank to negotiate a $1.5 million loan for that purpose. During the discussions, Mr. Klein suggested that Scope could realize a quick profit which could then be used to buy the Perdido Bay property and that he would try to guarantee the loan through Cavanagh. The final agreement was that the loan would be made at an interest rate of 2% more than the bank would pay on a certificate of deposit to be purchased by American Leisure, and Irwin Lampert, on behalf of American Leisure, then agreed that it would buy two certificates of deposit from the Great American Bank; one for $1.5 million at 10% and the other for $1.5 million at 16%, the latter being the market rate at the time. The bank loan to Scope was then made at 12%. It is a fair inference that the loan would not have been made without the agreement for the purchase of the certificates of deposit.

Also on March 21, 1980, a sales representative of Blinder-Robinson assisted his customer, Johan Van Baal, in obtaining a loan of $700,000.00 from Metro Bank for the purpose of assisting in the purchase of 400,-000 units of American Leisure. That purchase was effected on March 24, 1980.

The Metro Bank issued Blinder-Robinson a cashier's check, dated March 24, 1980, for $2,371,987.50 for the purchase of the 956,393 units which had not been sold to the public. Those 956,393 units were put in the Blinder-Robinson inventory trading account. The loan was not secured and it was not recorded in the bank's loan records, contrary to the routine business practice of the bank.

On March 25, 1980, the Metro Bank credited Blinder-Robinson for $2,475,000.00, an amount representing the firm's commissions for the sale of 10 million units. Also on March 25, 1980, the bank wired $3,000,-000.00 from the escrow account to the Miami bank for American Leisure to purchase certificates of deposit. Both of these distributions occurred prior to a formal closing of the offering. In fact, no closing ever took place. Most of the closing documents had been executed at the Metro Bank on March 20, 1980, when the offering was far short of completion. By letter of that date, an assistant vice-president of the Metro Bank wrote to the Division of Securities of the State of Colorado and included the following two paragraphs:

Kindly consider this letter our certification to you that there is on deposit in the above mentioned Escrow Account the aggregate sum of $25,000,000.00 the same being held for the purposes as set forth in the Escrow Agreement.

In view of the foregoing, the Metro National Bank, as Escrow Agent hereby request [sic] authorization from the Colorado Securities Commissioner to release to American Leisure Corp., and/or Blinder, Robinson and Company such funds now on deposit in the Escrow Account, or as may hereafter be deposited into said Escrow Account. (Plaintiff's Exhibit 39P).

At the trial of this matter that bank officer testified that the letter was actually delivered to the Colorado Securities Department on March 24, 1980, during working hours. That certification was false even as of March 24, because the $1,500,000.00 from the Miami bank did not arrive until March 25.

Blinder-Robinson began trading from the inventory of 956,393 American Leisure units with members of the public and other broker-dealers on March 25, 1980. From that date until July 18, 1980, Blinder-Robinson sold 2,209,320 units and purchased 1,828,715 units.

On August 28, 1980, the SEC and Blinder-Robinson orally stipulated that as of that date the firm would cease trading for its own account in American Leisure securities, and would freeze the firm's holdings in those securities. The stipulation permitted Blinder-Robinson to continue executing unsolicited agency transactions involving American Leisure securities. In a written stipulation filed on April 27, 1981, the Com-

mission and Blinder-Robinson agreed to vacate the earlier stipulation and substituted one which permitted Blinder-Robinson to resume its trading in American Leisure, but continued to require a freeze of the firm's holdings as of August 28, 1980. These stipulations define the continuing after-market distribution as from March 25, 1980 until August 28, 1980, although the evidence before the court traces Blinder-Robinson's after-market trading activity only through July 18, 1980.

## SECURITIES ACTS VIOLATIONS

*Sections 17(a), 10(b), and Rule 10b–5.* The SEC alleges that Blinder-Robinson violated Section 17(a) of the 1933 Act, Section 10(b) of the 1934 Act, and Rule 10b–5, by embarking on a fraudulent course of conduct throughout the firm's involvement in the American Leisure offering. The Commission points to alleged fraudulent conduct during Blinder-Robinson's effort to sell the offering, and in connection with the closing of the "all or none" offering. Defendants' position is threefold: 1) that the alleged misrepresentations were not material; 2) that defendants cannot be held responsible for the acts of their salespeople; and 3) that the SEC has failed to establish scienter. Upon consideration of all of the evidence, my conclusion is that Blinder and Blinder-Robinson violated Sections 17(a), 10(b), and Rule 10b–5.

At the outset it is noted that throughout the relevant time period defendants used the mails, telephone and other means of interstate commerce in their various transactions with regard to the American Leisure offering.

■ Sections 17(a) and 10(b) prohibit the use of a manipulative or deceptive device, or scheme or artifice to defraud, in connection with the offer, sale or purchase of any security. Section 17(a)(2) and Rule 10b–5 specifically prohibit the making of any untrue statement of material fact or the omission to state a material fact necessary in order to make the statements made not misleading. A "material fact" is one which a reasonable investor might have considered important in the making of an investment decision. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472–73, 31 L.Ed.2d 741 (1972). Actual reliance need not be shown, *id.,* but defendants' scienter must be established for purposes of Rule 10b–5, Section 10(b), and Section 17(a)(1). *Aaron v. Securities and Exchange Commission,* 446 U.S. 680, 691, 697, 100 S.Ct. 1945, 1952, 1956, 64 L.Ed.2d 611 (1980); *Securities and Exchange Commission v. Haswell,* 654 F.2d 698 (10th Cir. 1981).

Meyer Blinder and the Blinder-Robinson sales force aggressively promoted the American Leisure securities before the registration statement became effective and then followed the manipulative and deceptive practice of maintaining market interest by suggesting that the hotel-casino development would be assured because of deals that were being made. The sales presentations followed a pattern of misstatements and omissions. Sales representatives predicted that the American Leisure securities would open at a premium in the after-market, without any factual basis for their predictions. They told buyers that the firm's personnel had inside information about developments positively affecting the issuer, when in fact there were no positive developments for the new company during the distribution period.

The cancellations in March came largely as a result of the letter, dated March 10, 1980, from Gabriel Nagy as general counsel of Elkins to its customers, containing the following paragraphs, among others:

We have been informed that some interest in this offering has been generated in part by the expectation that ALC might invest some or all of the net offering proceeds in a casino project to be developed jointly with Cavanagh Communities Corporation ("CCC"). These two companies own neighboring parcels of land in Atlantic City, New Jersey, and there has been speculation in the public press that they might develop their properties jointly.

Partners and registered representatives of this Firm have substantial investments in CCC, and one of them currently serves as President of CCC.

We have also been informed that ALC and CCC had preliminary, tentative discussions sometime [sic] ago concerning the possibility of a joint development of their properties. However, we are told, no agreements or preliminary understandings resulted from those discussions, those discussions have been terminated and no negotiations or discussions are currently in progress between the two companies.

It is presently contemplated that the ALC offering will not settle before March 19, 1980. As noted above, we are not recommending the purchase of units. As the prospectus notes at page 9, you should understand that you may lose all or part of your investment in the units. If you decide that you do not wish to purchase the units, you may cancel this transaction *without obligation*, by so advising your registered representative by 4:00 P.M. on Thursday, March 13, 1980. (Plaintiff's Exhibit 40K).

Mr. Lampert, for American Leisure, and Mr. Padgett, for Blinder-Robinson, objected to this letter and urged that it not be sent because Mr. Lampert said that negotiations would continue. In my view, Elkins acted appropriately and Blinder-Robinson should have done the same thing. Given the sales practices which had been followed, the Blinder-Robinson customers buying the American Leisure units should have been given this information and the failure to provide it constitutes a fraudulent practice.

■ These statements and omissions are directly attributable to Blinder and, through him, to Blinder-Robinson.[1] It is clear that the Blinder-Robinson sales force practiced a program of deliberately deceptive misinformation which Blinder orchestrated. Even if the evidence did not demonstrate his active role, this court would hold Blinder liable for the acts of sales representatives whom he supervised and for whose misconduct he is responsible under Section 20 of the 1934 Act, 15 U.S.C. § 78t (1976). *A. J. White & Co. v. Securities and Exchange Commission*, 556 F.2d 619, 622 (1st Cir. 1977), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977); *Securities and Exchange Commission v. Commonwealth Chemical Securities, Inc.*, 410 F.Supp. 1002 (S.D.N.Y.1976), *aff'd. in part and modified in part*, 574 F.2d 90 (2nd Cir. 1978).

■ Blinder and Blinder-Robinson did not disclose the frantic manipulations which resulted in the pretension that all of the issue had been sold by the March 25 deadline. The investors were not told that $3,000,000.00 of the proceeds of the public offering had been committed to be used as an accommodation for the loan necessary for the Scope purchase with half of that amount invested at 6 points below the market rate. They were not told that the Metro Bank was so anxious to assist its good customer, Blinder-Robinson, that it found it expedient to make a $700,000.00 loan to a person who had no prior banking connection there, and to loan Blinder-Robinson almost the full amount of its commission with the bank paying itself off from that commission in immediate distribution of the first escrow. They were not told that Blinder-Robinson would, itself, purchase 956,393 units, and place them in inventory to participate in after-market transactions.[2]

The misstatements and omissions in this case are material. Information regarding

---

**1.** "A firm . . . can act only through its agents, and is accountable for the actions of its responsible officers." *A. J. White & Co. v. Securities and Exchange Commission*, 556 F.2d 619, 624 (1st Cir. 1977), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977). *Accord, Kerbs v. Fall River Industries, Inc.*, 502 F.2d 731, 741 (10th Cir. 1974).

**2.** The court finds without merit defendants' reasons for not attaching a sticker to the pro-

spectus, despite counsel's advice. Their claim that a sticker would be useless since all the prospectuses were distributed already is not a valid excuse: "If it was too late to disclose the change, the investors had a right to assume that the prospectus would be complied with, not changed." *A. J. White & Co.*, 556 F.2d at 623. Their fear of damage to Blinder-Robinson's business reputation does not excuse their nondisclosure, but simply demonstrates the

the condition of the issuing company is of great significance to the reasonable investor, particularly where the company is new. *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Moreover, in an "all or none" offering of securities by a new company, whether all the securities have been sold to the public in bona fide transactions is of particular importance because the "all or none" contingency is the investors' principal protection. Each investor is comforted by the knowledge that unless his judgment to take the risk is shared by enough others to sell out the issue, his money will be returned.

In *A. J. White & Co.*, where one-half of the minimum amount in an "all or none" offering was raised through non-bona fide short term loans, the First Circuit Court of Appeals affirmed the Commission's decision that the purported closing without disclosure of the purchases was a material omission under Sections 17(a) and 10(b), and Rule 10b–5:

> Particularly in cases such as this, an offering of shares in a new company, one of the investors' major concerns will be whether the price they are paying for the securities is a fair market price. The inability of the underwriter to sell the specified minimum to bona fide investors may well indicate that the market judges the offering price to be too high. Thus, to declare an offering completed through non-bona fide sales financed through bank loans, where the purported investors have not made an investment decision backed with their own money, may significantly mislead the legitimate investors as to a crucial factor in their decision.

*Id.*, 556 F.2d at 623.

Perhaps most telling in all of the evidence presented at the trial of this case is the testimony of Mr. Padgett that he and Meyer Blinder decided to make a business decision contrary to the advice of their attorneys because to do otherwise would be very damaging to the company's reputation by letting it be known that it could not sell out this offering. That is an admission of materiality.

The requisite scienter for a violation of Sections 17(a)(1), 10(b), and Rule 10b–5, has been defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n.12, 96 S.Ct. 1375, 1381, n.12, 47 L.Ed.2d 668 (1976). The courts of appeal are in agreement that reckless behavior satisfies the scienter requirement. *Hackbart v. Holmes*, 675 F.2d 1114 at 1117 (10th Cir. 1982). In *Hackbart*, the Tenth Circuit adopted the following definition of recklessness: " 'an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Hackbart*, at 1118 (quoting *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977)).

Defendants' contention that their mental state fell short of the requisite scienter is rejected.[3] The evidence fails to establish a basis in fact for the representations made by Blinder to his sales force regarding American Leisure's prospects for success. Rather, it shows that Blinder knew that the company had no positive developments during the distribution period, and that the offering was meeting with difficulty. The defendants knew that the closing of March 25, 1980 was a pretense. There is no more telling indication of knowledge than the direct receipt of the advice of the involved

---

materiality of the omissions, as discussed *infra* at 476–477.

**3.** Of course, Blinder-Robinson is a corporate entity which is not capable of possessing a "mental state." But for purposes of establishing scienter, Blinder's mental state is imputed to Blinder-Robinson. *Securities and Exchange Commission v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1096–97, nn. 16–18 (2nd Cir. 1972).

attorneys to attach a sticker to the prospectus. But despite that knowledge of the materiality of their conduct, and its potential consequences, they ignored counsel's advice. This is not a case of "recklessness"; the defendants acted with a knowing "intent to deceive, manipulate, or defraud" under *Ernst & Ernst.*

█ *Rule 10b–6.* The SEC alleges that Blinder and Blinder-Robinson violated Rule 10b–6 when the firm purchased for its trading account 956,393 American Leisure units, continued selling those units to the public, and simultaneously bid for and purchased American Leisure units. Defendants' position is that the firm's purchase of the remaining American Leisure units prior to the specified closing date of the "all or none" offering operated to complete the offering and to remove subsequent activities from the ambit of the rule.

Rule 10b–6 was promulgated by the SEC under Section 10(b) of the 1934 Act, and is designed to prohibit market manipulation by any person participating in the distribution of a security for the duration of that participation. In this case the SEC has established that defendants participated in a distribution of American Leisure units, which continued beyond the specified closing date of the offering, and that during their participation defendants bid for and purchased American Leisure units, in manipulation of the market and in violation of Rule 10b–6.[4]

Rule 10b–6 does not define "distribution" as used therein, but in its administrative decisions the SEC has clarified the meaning of the term. In *Gob Shops of America,* Securities Act Release No. 4075 (May 6, 1959), the Commission held that a "major selling effort" would constitute a distribution, and in *Collins Securities Corp.,* Securities Exchange Act Release No. 11766 (October 23, 1975) [1975–76 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 80,327, *remanded on other grounds,* 562 F.2d 820 (D.C.Cir. 1977), the SEC set out the following test:

Rule 10b–6 . . . is designed to prevent manipulation in the markets. To that end, it precludes a person from buying stock in the market when he is at the same time participating in an offering of securities which is of such a nature as to give rise to a temptation on the part of that person to purchase for manipulative purposes. The term distribution in Rule 10b–6 should therefore be interpreted to identify situations where that temptation may be present.

The Commission also noted that "Rule 10b–6 undoubtedly applies to most registered offerings." *Id.*

It is clear that the American Leisure offering constituted a "distribution." Moreover, that distribution continued beyond March 25, 1980, the date of the purported closing, because the purchases and subsequent sales of American Leisure units by Blinder-Robinson was a continuing aftermarket distribution of the securities. Rule 10b–6(c)(3) defines an underwriter's participation in a distribution as complete "when he has distributed his participation, including all other securities of the same class acquired in connection with the distribution . . ." According to the American Leisure prospectus, Blinder-Robinson's participation was the sale of 10 million units "to the public" (less 2 million units which were reserved for sale to BBB shareholders). (Plaintiff's Exhibit 1, at 46–7). With its purchase of 956,393 units, it fell short of completing its distribution by that amount and, consequently, the distribution continued after the purported closing. *R. A. Holman & Co. v. Securities and Exchange Commission,* 366 F.2d 446, 449 (2d Cir. 1966), *modified on other grounds,* 377 F.2d 665 (2d Cir. 1967), *cert. denied,* 389 U.S. 991, 88 S.Ct. 473, 19 L.Ed.2d 482 (1967); *Securities and Exchange Commission v. Commonwealth Chemical Securities, Inc.* ; Whitney, "Rule 10b–6: The Special Study's Rediscov-

---

4. For purposes of Rule 10b–6, the court holds Blinder, as the president and controlling officer of Blinder-Robinson, liable for the firm's misconduct. The evidence presented at trial shows that the firm's purchase of American Leisure units and its subsequent market manipulation was either known to Blinder or at his direction.

ered Rule," 62 *Mich.L.Rev.* 567,575 (1964). The parties stipulated that Blinder-Robinson would cease trading for its own account in American Leisure units beginning August 28, 1980. The court concludes that the after-market distribution lasted from March 25, 1980 until that date.

The court finds that during the continuing after-market distribution, defendants purchased and sold a large volume of American Leisure units. Those activities constitute the precise types of conduct forbidden by the rule, due to the potential for market manipulation by underwriters who stand to gain from an active market.

Defendants contend that the SEC has not established scienter for purposes of Rule 10b–6. Whether scienter is required under the rule has not been decided by the Supreme Court, and this court is aware of no lower court decision which has considered the issue since the Supreme Court's decisions in *Ernst & Ernst v. Hochfelder*, and *Aaron v. Securities and Exchange Commission*. It is not necessary to reach that issue in this case, because the evidence reveals that defendants acted with scienter throughout their involvement with the American Leisure offering. This finding certainly applies to defendants' continuation of the distribution by virtue of their purchase of the remaining 956,393 units, and their subsequent purchase of additional American Leisure units.

*Rule 10b–9.* Under Rule 10b–9 a representation that an offering is on an "all or none" basis constitutes a manipulative or deceptive device prohibited by Section 10(b), unless prompt refunds are made to purchasers if all the securities are not sold at the specified price within the specified time and if the total amount due the seller is not received by it by the specified date. Defendants plainly violated this rule. They underwrote an offering on a "best efforts, all or none" basis; and they failed to promptly refund consideration received from purchasers when, on the specified deadline date, less than all of the securities had been sold, and less than the total proceeds due the seller had been received.

There is no dispute that this was an "all or none" offering, or that Blinder-Robinson failed to refund consideration paid by purchasers of American Leisure units. Defendants' position is that they had no obligation to refund the consideration. They contend that all 10 million units were sold by March 25, 1980; that all the money due the seller was received by that date; and hence, no refund was required.

The SEC has stated that "under Rule 10b–9, an offering may not be considered 'sold' for purposes of the representation 'all or none' unless all the securities required to be placed are sold in *bona fide transactions* and are fully paid for." Securities Exchange Act Release No. 11532 (July 11, 1975), 2 Fed.Sec.L.Rep. (CCH) ¶ 22,730 (emphasis added). The Commission specifically indicated that "sales designed to create the appearance of a successful completion of the offering, such as purchases by the issuer through nominee accounts or purchases by persons whom the issuer has agreed to guarantee against loss," are "non-bona fide sales." *Id.* The court finds that the last-minute transactions through which Blinder-Robinson "sold" almost 2 million units between March 21 and March 24, 1980, were not bona fide sales. *See Securities and Exchange Commission v. Coven*, 581 F.2d 1020, 1028, n.16 (2d Cir. 1978), *cert. denied*, 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979); *Securities and Exchange Commission v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1095 (2d Cir. 1972).

In addition, the SEC established at trial that the $25 million due American Leisure was not received by the deadline of March 25, 1980. On March 24, 1980, the Metro Bank issued Blinder-Robinson a cashier's check in the amount of $2,371,987.50 for the purchase by the firm of the 956,393 units which had not been sold to the public. Although Blinder-Robinson and the bank called this transaction a "loan," the court is persuaded that it was in fact a distribution of commissions from the proceeds of the offering, prior to its completion. Because this payment occurred prior to March 25, on that date the escrow account was short of

the requisite $25 million. Moreover, proceeds received from non-bona fide sales must be considered non-bona fide proceeds which, even though present in the account on March 25, cannot be counted as part of the $25 million specified in the offering prospectus.

■ *Section 15(c) and Rule 15c2–4.* Rule 15c2–4, promulgated under Section 15(c) of the 1934 Act, requires the underwriter to establish and maintain an escrow account or separate bank account for all funds received, which funds must remain segregated and untouched until the occurrence of the "all or none" contingency which completes or vacates the offering. Blinder and Blinder-Robinson established an escrow account at the Metro Bank and it appears that they deposited proceeds from sales into that account as they were received. However, the evidence shows that defendants transferred proceeds from the account prior to the occurrence of the "all or none" contingency on March 25, 1980, and failed to return purchasers' funds upon the occurrence of the contingency. The evidence demonstrates clear violations of Section 15(c) and Rule 15c2–4.

Proceeds were removed from the account, pursuant to defendants' instructions, on at least two occasions. On March 25, 1980, the bank wired $3 million from the escrow account to a Miami bank for use by American Leisure in order to accommodate a loan which the Miami bank agreed to make to Scope. On March 24, 1980, the bank made a purported "loan" to Blinder-Robinson, in which it actually distributed to the firm its commissions from the offering. Withdrawal of those funds prior to the sale of all 10 million American Leisure units was unlawful. *See Securities and Exchange Commission v. Coven,* 581 F.2d at 1028–29 n.17.

In an interpretative release, the SEC has stated that for purposes of Rule 15c2–4:

If the contingency is "all or none," this requirement means that no funds may be disbursed from the agency or escrow account until all the securities are sold in bona fide transactions and are finally paid for.

Securities Exchange Act of 1934 Release No. 11532 (July 11, 1975). The court has determined that almost 2 million American Leisure units were sold in non-bona fide transactions, *supra,* at 19, which prohibited the completion of the offering and the lawful disbursement of funds from the escrow account to persons other than the purchasers. Yet, defendants failed to return purchasers' funds promptly after the deadline of March 25, 1980, and have not returned those funds to this day. Instead, having indirectly received their commissions through the Metro Bank "loan," they turned over the remaining funds to the issuer. This is the precise conduct prohibited by Rule 15c2–4. *FAI Investment Analysts, Inc.,* Securities Exchange Act Release No. 14288 (December 19, 1977).

■ *Aider and abettor liability.* As a general defense to the violations which occurred during the American Leisure offering, defendants claim that they should not be held liable for the conduct of individual sales representatives. But, Blinder-Robinson is responsible for its employees' actions where those actions were directed by the firm, through Blinder. 15 U.S.C. § 78t (1976). *See* n.1, *supra* at 12. The liability of Blinder, as president and controlling officer of Blinder-Robinson, is the same as that of the firm. *A. J. White & Co.,* 556 F.2d at 621–22; *Commonwealth Chemical Securities, Inc., supra.*

Defendants have not raised as an issue the extent of their liability as aiders and abettors for conduct of other involved persons, but that issue is relevant where, as in this case, liability under the securities laws is premised in part on contributing conduct by persons not before the court.[5] Specifically, between March 19 and March 25, 1980, Irwin Lampert met with Leon Joseph,

---

5. Defendants' violations of Sections 17(a) and 10(b), and Rules 10b–5 and 10b–6, result solely from their own misconduct. However, the violations of Section 15(c) and Rules 15c2–4 and 10b–9, involve misconduct of the Metro Bank and of the persons who arranged the loan to Scope.

Joseph Klein and Zola Klein to negotiate an arrangement whereby Scope would borrow $1.5 million and purchase 600,000 American Leisure units, and American Leisure would accommodate that bank loan by purchasing from the lending bank certificates of deposit in the amount of $3 million. On March 20, 1980, an assistant vice president of the Metro Bank wrote to the state securities regulation agency certifying the amount deposited in the escrow account as $25 million; on March 24, the bank made a purported "loan" to Blinder-Robinson which was actually a distribution from the proceeds of the offering; on March 25, the bank wired $3 million from the account for American Leisure to purchase certificates of deposit from the Miami bank; and on March 24 or 26,[6] the bank released the funds from the escrow account to American Leisure.

█ What is significant is that none of the above activities by third parties occurred in a vacuum. Rather, those activities were either at the direction of Blinder and Blinder-Robinson, or with their full knowledge and tacit approval; and the particular actions taken by the bank and others were simply component parts of the overall scheme which Blinder and Blinder-Robinson orchestrated to give the appearance of completing the offering by March 25, 1980. Under these circumstances, defendants are both directly liable as primary but silent participants, and secondarily liable as aiders and abettors. *Securities and Exchange Commission v. Coven*, 581 F.2d at 1028–29; *Kerbs v. Fall River Industries, Inc.*, 502 F.2d 731, 740 (10th Cir. 1974).

*Good faith reliance defense.* The defense of good faith reliance on advice of counsel, raised by Blinder-Robinson, is without merit. Although several courts have held that reliance on the advice of counsel can contribute to a general "good faith" defense to certain violations of the securities laws, none has recognized that defense under facts such as are present in this case.

Blinder-Robinson contends that prior to purchasing American Leisure units, it sought legal advice as to the propriety of such a purchase. It is undisputed that early in March, 1980, Meyer Blinder, acting for Blinder-Robinson, asked attorney Bernard Feuerstein to find out whether the firm, as the underwriter in a "best efforts, all or none" offering, could purchase the subject securities. In response to Blinder's request, Feuerstein did not render a formal opinion, but simply relayed the information received from a staff attorney at the SEC that there was no absolute restriction or special rule prohibiting an underwriter from purchasing the offered securities in an "all or none" offering. At no time did Blinder inquire as to the legality of other action it took to complete the offering by its deadline of March 25, 1980, and when later advised that a sticker should be placed on the prospectus, disclosing the purchase, Blinder-Robinson declined to follow that advice.

█ As discussed earlier in this opinion, the evidence supports a finding that Blinder-Robinson acted with scienter in all its violations of the securities laws. This finding of scienter precludes a finding of good faith by the firm with respect to the same actions. *See Securities and Exchange Commission v. Bonastia*, 614 F.2d 908, 914 (3d Cir. 1980) (affirming district court's rejection of defense of good faith reliance on advice of counsel, "in view of the high ranking positions [defendant] held with the various companies engaged in the illegal activity and the specific finding of scienter made by the district court.").

█ There are additional reasons why the defense fails these defendants. A defendant invoking his reliance on the advice of counsel must establish that he made a complete disclosure to counsel and then followed the advice rendered. *Securities and Exchange Commission v. Savoy Industries, Inc.*, 665 F.2d 1310, 1314 n. 28 (D.C.Cir.1981)

6. The statement for the American Leisure escrow account reflects a debit of $22,130,276.72 on March 26, 1980. (Plaintiff's Exhibit 12f). But, in a handwritten ledger for that account maintained by the Metro Bank International Department, the payment to American Leisure is shown to have occurred on March 24. (Plaintiff's Exhibit 12g).

(*dictum*); *United States v. Hill*, 298 F.Supp. 1221, 1235 (D.Conn.1969). Blinder did not make a complete disclosure to Feuerstein when he requested advice regarding the purchase of American Leisure units. He indicated the possibility that Blinder-Robinson would buy units, but not that the firm would buy for its trading account and continue to sell the securities to the public after March 25, 1980. He did not disclose the possibility of accommodating loans to sell units to third parties, or that the firm would draw its commissions from the proceeds of the offering, prior to the closing, to purchase the American Leisure units. This information was material to the advice sought, and its omission precludes Blinder-Robinson from claiming reliance on that advice.

■ The greatest obstacle to Blinder-Robinson's claimed good faith defense is that the firm failed to follow the advice rendered by counsel. By March 20, 1980, Feuerstein and attorneys for Blinder-Robinson had advised Meyer Blinder and Mr. Padgett, vice-president of Blinder-Robinson that a sticker on the prospectus would be necessary to disclose the intended purchase, which the lawyers viewed as a material development. The firm specifically declined to follow that advice, for fear that disclosure of its intent to purchase units would injure its business reputation, and in the belief that no additional prospectuses would be distributed. It is plain that Blinder-Robinson cannot hide now behind legal advice which it chose to ignore. *Securities and Exchange Commission v. Senex Corp.*, 399 F.Supp. 497, 507 (E.D.Ky.1975), aff'd., 534 F.2d 1240 (6th Cir. 1976).

Upon the foregoing, it is

ORDERED, that the defendants, Blinder-Robinson & Co., Inc. and Meyer Blinder, and their officers, directors, agents, servants, employees, attorneys, successors and assigns, and those persons in active concert or participation with them, and each of them, be and they are hereby permanently enjoined, from directly or indirectly, in connection with the offer to sell, sale, delivery after sale or purchase of any securities of any issuer whatsoever, including, but not limited to, units (of common stock and warrants), common stock and warrants of American Leisure Corp., through the use of any means or instruments of transportation or communication in interstate commerce, or of the mails:

(1) employing any device, scheme, or artifice to defraud; or

(2) obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(3) engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser or upon any person; or

(4) using or employing, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors; or

(5) bidding for or purchasing for any account in which they have a beneficial interest, any security which is the subject of a particular distribution of securities in which they have agreed to participate, or any security of the same class and series, or any right to purchase any such security, or attempting to induce any person to purchase any such security or right, until after they have completed their participation in such distribution; or

(6) making any representation to the effect that any security is being offered or sold on an "all or none" basis unless the security is part of an offering or distribution being made on the condition that all or a specified amount of the consideration paid for such security will be promptly refunded to the purchaser unless (a) all of the securities being offered are sold at a specified price within a specified time, and (b) the

**482**

total amount due to the seller is received by him by a specified date;  or

(7) making any representation to the effect that any security is being offered or sold on any other basis whereby all or part of the consideration paid for any such security will be refunded to the purchaser if all or some of the securities are not sold, unless the security is part of an offering or distribution being made on the condition that all or a specified part of the consideration paid for such security will be promptly refunded to the purchaser unless (a) a specified number of units of the security are sold at a specified price within a specified time, and (b) the total amount due to the seller is received by him by a specified date;  or

(8) accepting any part of the sale price of any security being distributed unless the money or other consideration received is promptly transmitted to the persons entitled thereto;  or

(9) accepting any part of the sale price of any security being distributed unless, if the distribution is being made on an "all or none" basis, or on any other basis which contemplates that payment is not to be made to the person on whose behalf the distribution is being made until some further event or contingency occurs, (a) the money or other consideration received is promptly deposited in a separate bank account, as agent or trustee for the persons who have the beneficial interests therein, until the appropriate event or contingency has occurred, and then the funds are promptly transmitted or returned to the persons entitled thereto, or (b) all such funds are promptly transmitted to a bank which has agreed in writing to hold all such funds in escrow for the persons who have the beneficial interests therein and to transmit or return such funds directly to the persons entitled thereto when the appropriate event or contingency has occurred.