**PEOPLES NATIONAL BANK OF WASHINGTON, a national association; Plaintiff,**

v.

**Paul Dean NICHOLS, Sally Nichols, Roger Brinkley, Karen Brinkley, and W. Leigh Campbell, dba Nicabi and N.B. Properties, aka N/B Properties; Defendants.**

**PEOPLES NATIONAL BANK OF WASHINGTON, a national association; Plaintiff,**

v.

**Eldon C. EVANS; Defendant.**

**Civ. Nos. 83–1307–FR, 84–647–FR.**

United States District Court, D. Oregon.

July 10, 1985.

Don H. Marmaduke, Scott G. Seidman, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Or., for plaintiff.

Eric R. Haessler, Thomas S. Moore, Portland, Or., for defendants.

## OPINION

FRYE, Judge:

Plaintiff, Peoples National Bank of Washington (Peoples), brings these consolidated actions to collect on various promissory notes given by defendants to Peoples. Peoples contends that the promissory notes arose out of loans made by Peoples to defendants so that defendants could purchase stock in Willamette Falls State Bank (WFSB).

In their Affirmative Defenses and Counterclaims, defendants allege that the transactions between Peoples and defendants are not loans, but are installment sales of WFSB stock in which Peoples participated as a seller.

Defendants contend that following an alleged undisclosed agreement between Peoples and WFSB, Peoples acted in concert with others in the sale of WFSB stock to public investors, including defendants; that defendants' notes to Peoples are an integral part of the stock selling plan and the sale of the WFSB offering; and that stock sales were made to defendants with material omissions, misstatements of fact, and misleading acts.

Defendants deny liability on the promissory notes and seek to affirmatively recover damages and punitive damages from Peoples for common law fraud and violations of federal and state securities laws and federal and state racketeering laws.

In the matter before the court, Peoples moves for summary judgment on its claims against defendants and on all counterclaims asserted by defendants against Peoples. In the alternative, Peoples moves for partial summary judgment dismissing defendants' counterclaims.

## FACTUAL BACKGROUND

Efforts to organize WFSB began in late 1978 with the actions of David Peery, the prospective president of WFSB. On January 1, 1979, a prospectus was issued offering the sale of stock. The prospectus represented that all proceeds from the sale of the stock would be deposited and main-

tained in an escrow account in Peoples and that no funds would be released from the account until the stock offering was fully subscribed and paid for and the release authorized by the Oregon Superintendent of Banks.

In September, 1979, the escrow funding requirements had been satisfied. Thereafter, a charter was issued to WFSB and the escrow funds were released. Soon thereafter, WFSB opened its doors. The subsequent events are in dispute but it is uncontroverted that WFSB failed.

The dispute in this action arises out of the purchase by the defendants of stock in WFSB. Defendants executed and delivered promissory notes to Peoples in order to purchase stock in WFSB. There is no dispute between the parties that these promissory notes were executed and that they are now in default. The issue before the court is whether the defendants have any defenses or counterclaims entitling them to relief from the obligations on the notes.

Peoples contends that it acted solely as a lender in the transactions and performed only ordinary banking functions. It contends that there is no issue of material fact as to defendants' liability on the notes.

Defendants contend that they are not obligated to pay the notes because the transactions between the parties were, in fact, conditional installment sales in that Peoples has at all material times retained possession of the stock. In addition, defendants contend that as an offset, counterclaim, or by way of recoupment, they are entitled to recover damages equal to all sums paid to Peoples and others for WFSB's shares, together with interest thereon since the date paid; to relief from all obligations that Peoples claims are owed by defendants; and to costs and reasonable attorney fees. Defendants contend that Peoples' actions constitute violations of (1) Sections 12 and 17 of the Securities Act of 1933, 15 U.S.C. § 77(*l*), (q); (2) Section 10 of the Securities Exchange Act of 1934 and Rule 10b–5, promulgated thereunder, 15 U.S.C. § 78j; (3) RICO, 18 U.S.C. §§ 1341, 1343, and 1961; (4) Oregon Securities Law, ORS Chapter 59; (5) common law fraud; and (6) Oregon RICO, ORS Chapters 164 and 166.

Defendants contend that Peoples acted fraudulently in affirmatively misleading them and in failing to disclose material facts which it had a duty to disclose. Defendants advance the following version of the facts, relying upon a number of affidavits and depositions:

As a part of an aggressive funding of an active participation in the organization of a system of correspondent banks, Chris Collins, manager of Peoples' correspondent banking division and/or Dan Doyle, Collins' boss and Peoples vice-president in charge of Peoples correspondent banking division, contacted David Peery. After meeting, Peery and Peoples agreed that in return for Peoples becoming WFSB's major correspondent bank, Peoples would (1) advance Peery $75,000 to pay organizational expenses including salaries and costs of stock sales; (2) fund 75% of share subscriptions to prospective purchasers of substantial amounts of shares, at the unusually low interest rate of prime plus one-half; (3) Peoples would serve as escrow for the offering; and (4) Peoples would advance or commit $74,000 for acquisition of a mobile home for the initial banking facility.

The sale of stock was commenced in January, 1979, pursuant to the prospectus. The prospectus was materially deficient in that it did not disclose that (1) Peoples was funding the organization and stock sale; (2) Peoples was making substantial loans to principal officers of WFSB; (3) Peoples had agreed to make 75% loans to officers, directors, and major purchasers of stock; (4) Peoples was going to become WFSB's principal correspondent bank; (5) these commitments and arrangements had been agreed upon between Peoples and WFSB in October, 1978, before the preparation of the prospectus and commencement of the stock

sale; and (6) Peoples had initiated all of these transactions.

Peery and Richard Russell, a prospective vice president of WFSB, began calling upon local residents of Oregon City to make stock sales. Collins and Doyle joined them in calling upon prospective buyers. Peoples opened an escrow account in Seattle to accept proceeds from the stock sale. Perry, Russell, Doyle, and Collins advised prospective buyers that Peoples would make 75% loans in connection with WFSB stock purchases.

Notwithstanding these efforts, WFSB stock sales were lagging by late March, and organizers, at the insistence of Peoples, turned to lawyer Thomas E. Wolf. Irving Potter, Wolf's law partner, became secretary and director of WFSB, and Wolf became personally active in the stock sale. Wolf was a personal friend of Peoples' Executive Vice President Charles Riley and had participated jointly with Peoples in the funding and organization of at least five other banks.

Peoples and Wolf used similar methods in organizing the other five banks, including recruiting young branch managers without senior managerial experience to serve as prospective presidents, to make stock sales, and to enroll prominent local people to serve as directors. These five other banks all failed. Defendants were caught in this type of sales pitch and are local people with no real experience in stock ownership, securities, or banking.

Wolf assumed primary responsibility for the sale of the balance of the stock after he was retained, placing approximately 60,000 shares. A substantial amount of these shares were "parked"; that is, sold to subscribers with the understanding that they would be resold after the close of escrow. Peoples financed all but one of these sales, which was financed by funds from a trust account under Wolf's fiduciary control.

In late August, 1979, Wolf and Peery flew to Seattle with two prospective buyers to meet Collins and Doyle of Peoples. With Peoples funding the loan, Collins and Doyle purchased the final shares necessary to release the funds from escrow. Defendants allege that the shares were parked and submit the affidavits of Collins and Doyle which state that they were told by Wolf they would *not be personally at risk* in the purchases. The bank then opened.

WFSB had a serious market problem when it opened because approximately 60% of the outstanding shares were pledged to Peoples subject to interest and repayment requirements. In addition, a significant number of shares had been "parked" with a commitment that the investor would incur no risk, and that the shares would be resold. As a result, WFSB was unable to raise any further capital to meet expenses because of the recurring pressure to sell pledged shares to relieve doubtful loans and promises to parkees. The resulting pressure becomes particularly intense if the apparent market price drops below the public offering price ($10/share in this case). Peoples and Wolf advised that WFSB stock would go up in value and stated that investors, including defendants, should make particular purchases in order to keep the price of the shares on resale above the $10 level. In other words, Wolf and Peoples promoted price manipulation.

On October 12, 1979, Doyle of Peoples, Peery of WFSB, and Wolf met with defendant Paul Dean Nichols and urged Nichols to become a director and shareholder because he could influence deposits from Tri-Met (he was on their board) and other public bodies. On November 8, Wolf and Collins of Peoples met with Nichols and urged him to buy stock, stating that the market value was $11 and that there was a buyer for all outstanding stock at $13. Collins stated that it could go higher. In December, 1979, Nichols purchased 100 shares for $1200 and agreed to become a director. In early April Nichols met with Wolf and Charles Riley, Peoples' Executive Vice President, who spoke enthusiastically

about WFSB stock. A few days later Nichols purchased 1900 shares with a 75% loan from Peoples.

In May, 1980, Nichols and Joyce Evans were encouraged to and did buy additional shares. In late June, 1980, Nichols purchased more. In January, 1981, Nichols and Joyce Evans bought out the shares of Peery. In all of these transactions, Peoples failed to disclose that the proceeds were being applied to pay off loans to Peoples and that Peoples had a duty to disclose this information.

The price manipulation and maintenance above $10 a share ended abruptly when Peoples stopped financing purchases of stock through a revolving succession of loans.

Peoples contends that the defendants manipulated their positions as directors and affiliates to arrange massive "insider" loan transactions as well as to acquire large blocks of stock in the speculative hope that they would make "a killing" should WFSB be acquired, or merged into, a larger bank. Peoples contends that the WFSB management mismanaged WFSB's affairs, allowing it to become overextended in its loan-to-deposit ratio in general and with respect to "insider" transactions in particular. Peoples points to a review of WFSB by the Federal Deposit Insurance Corporation (FDIC) in which it criticized the poor quality of WFSB's portfolio, the inept direction of WFSB, and the "insider" loan transactions.

On December 14, 1981, the FDIC formally charged WFSB with numerous unsound banking practices, including maintaining insufficient loan loss reserves and making improper insider loans. On or about that same date WFSB's directors received a consent decree, which they subsequently signed, acknowledging that they had mismanaged WFSB's affairs.

Peoples contends that it was through mismanagement that the stock defendants purchased became worthless and that defendants are now trying to avoid their obligations to Peoples by asserting a host of groundless defenses and counterclaims.

## PEOPLES' MOTION FOR SUMMARY JUDGMENT ON ITS CLAIM

There is no dispute as to the execution and default of the loans. Defendants assert as a defense that the loans were conditional sales agreements because Peoples has retained the stock at all times.

## DEFENDANTS' COUNTERCLAIMS

Defendants assert six counterclaims based upon federal and state law.

1. Sections 12 and 17 of the Securities Act of 1933:

 Section 12 of the Securities Act of 1933 specifically exempts "any security issued or guaranteed by a bank." Section 3(a)(2). Furthermore, there is no private right of action under Section 17(a) of the Securities Act of 1933 for the reasons stated in *Brabham v. Patenta, N.V.*, 614 F.Supp. 568 (D.Or.1984). Plaintiff's motion for summary judgment on defendants' counterclaim under the Securities Act of 1933 is GRANTED.

2. Section 10 of the Securities Exchange Act of 1933 and Rule 10b–5.

 Section 10(b) makes unlawful the use or employment of "any manipulative or deceptive device or contrivance" in contravention of the rules of the Securities Exchange Commission (SEC). The elements of a private cause of action under Rule 10b–5 are: (1) a misstatement or an omission (2) of a material fact (3) made with scienter (4) upon which the plaintiff relied (5) that proximately caused his or her injury.

 In addition, the elements of a cause of action for aiding and abetting under section 10(b) are: (1) the existence of an independent wrong; (2) actual knowledge by the alleged aider and abetter of the wrong and of his or her role in furthering it; and (3) substantial assistance in the wrong. *Harmsen v. Smith*, 693 F.2d 932, 943 (9th Cir.1982). Liability as an aider and abetter attachs where the defendant owed a duty to disclose material facts to

the claimant. In determining the scope of that duty the court should consider: (1) the relationship of the defendant to the plaintiff; (2) the defendant's access to information compared to that of the plaintiff; (3) the benefit the defendant derived from the relationship; (4) the awareness by the defendant of the plaintiff's reliance on him or her; (5) the defendant's activity in initiating the securities transaction in question. *Stephenson v. Calpine Conifers II, Ltd.*, 652 F.2d 808 (9th Cir.1981).

Peoples contends that defendants have failed to identify with requisite specificity any material misrepresentations made by Peoples' employees and have created confusion as to who made what allegation, thereby branding Peoples through guilt by association. Peoples asserts that it provided no more than ordinary banking functions in the transactions at issue and therefore had no duty to disclose to the defendants.

Peoples would have no duty to disclose where it performed only ordinary banking functions, but defendants contend that Peoples was a seller or a substantial participant in the sales of WFSB stock to defendants and therefore had a duty to disclose. In addition, defendants contend that the announced completion of the WFSB offering with such a large quantity of shares "parked" and/or pledged to Peoples constitutes manipulative conduct in violation of Section 10 and Rule 10b–5.

Defendants submit the affidavits of three individuals who state that they bought shares at the urging of Wolf that "they would not be personally at risk on the shares." This is the evidence upon which defendants rely to support their contention that there was "parking" of the shares. Peoples contends that if there was some wrongdoing, it was at the hands of Wolf, and the defendants should sue Wolf. There remains an issue as to whether Peoples was aware of Wolf's activity. The connection between Wolf and Peoples was a close one. In addition, the individuals who allegedly purchased shares that were "parked" received loans from Peoples, and it is possible that Peoples was aware of the arrangement. If Peoples was aware of Wolf's arrangements, there would be an issue as to aiding and abetting, if there was a duty to disclose.

The significance of this alleged "parking" is explained in the case of *A.J. White & Co. v. Securities and Exch. Com'n*, 556 F.2d 619 (1st Cir.1977), where the initial stock offer was made to appear successful when about half of the minimum amount was raised through short-term loans rather than bona fide sales to investors. The court explained:

Our question, therefore, is whether it matters significantly to investors that about one-half of the minimum amount was raised through short-term bank loans rather than bona fide sales to investors. We believe the Commission's conclusion that this, too, was a serious violation was well within its discretion. The knowledge that the minimum amount has been sold to bona fide investors may be a very important matter to the other investors. Particularly in cases such as this, an offering of shares in a new company, one of the investors' major concerns will be whether the price they are paying for the securities is a fair market price. The inability of the underwriter to sell the specified minimum to bona fide investors may well indicate that the market judges the offering price to be too high. Thus, to declare an offering completed through non-bona fide sales financed through bank loans, where the purported investors have not made an investment decision backed with their own money, may significantly mislead the legitimate investors as to a crucial factor in their decision.

Nor are the initial investors the only ones likely to be harmed. If the scheme employed by petitioners was to be successful, and the loans repaid, there had to be persons willing to purchase Develco stock after the offering at a price above, or at least equal to, the initial offering price. Such investors, too, would probably be influenced by the representation

that the offering had been successful when deciding whether to purchase. Thus, petitioners' contention that "[n]o manipulation took place," and that no investors lost any money as a result of their actions, may well be short-sighted— many investors may have paid more for these securities than they would otherwise have done, or bought them when they would not otherwise have done so, with, incidentally, White receiving part of the profit.

There may be a question of fact as to whether the affiant stock purchasers were bona fide purchasers since they agreed to a purchase where they were assured that they would not be personally at risk in the purchase. In addition, there is some evidence through the affidavit of Richard T. Busby that this arrangement existed between Wolf and David Clery, an individual who purchased stock with Wolf as personal guarantor.

Lastly, Peoples asks the court to grant its motion for summary judgment on the grounds that these facts were discovered by defendants prior to the two year statute of limitations period. Defendants submit affidavits stating that they did not know of the alleged misrepresentations and omissions until after 1983, yet their depositions indicate that some of the facts were discussed prior to that time. These are disputed issues of fact for a trier of fact.

The remaining issues under 10b–5 are scienter and causation. Peoples urges the court to find that there is no material issue of fact that the defendants' loss was caused by mismanagement of bank officials. Peoples relies upon the consent decree signed by bank directors admitting mismanagement. While a jury could find that the failure of the bank was due to mismanagement, a jury could also find that the failure was due to inadequate capitalization and artificial price inflation. Furthermore, a jury could conclude that these defendants would not have made the initial purchases if all the facts were on the table. Joyce Evans states in her deposition:

A. Well, if I'd have known that, to me it would have signified that Peoples was funding the opening of this new bank completely and then it would have been like a branch of Peoples. And we had the conception that it was a totally local thing that was going to be a community start of an independent bank and that these organizers were putting up their own money to get this thing off the ground. And if we'd have known that this was an out-of-state bank's promotion or whatever you want to call it, we wouldn't have gone into it. And I think a lot of other people wouldn't have.

Plaintiff's motion for summary judgment on defendants' counterclaim under Section 10 of the Securities Exchange Act of 1934 and Rule 10b–5 is DENIED.

**3. Claims under RICO and ORICO.**

Defendants' counterclaims under RICO and ORICO are dismissed. *See Willamette Sav. & Loan v. Blake & Neal Finance Co.,* 577 F.Supp. 1415 (D.Or.1984).

**4. Common Law Fraud.**

Since the court has declined to grant to plaintiff summary judgment as to defendants' counterclaim for a violation of Section 10 of the Securities Exchange Act of 1934, it also declines to grant summary judgment to plaintiff on defendants' common law fraud counterclaim.

IT IS ORDERED that

1. Plaintiff's motion for summary judgment on defendants' counterclaim under the Securities Act of 1933 and RICO and ORICO is GRANTED.

2. Plaintiff's motion for summary judgment on defendants' counterclaim under Section 10 of the Securities Exchange Act of 1934 and Rule 10b–5 and common law fraud is DENIED.

### ON MOTION TO AMEND PRETRIAL ORDER

In the matters before the court the defendants move (1) to amend the pretrial order to include an allegation that plaintiff

violated 18 U.S.C. § 1962 and (2) to reconsider this court's order of July 10, 1985 dismissing defendants' counterclaims under RICO and ORICO.

Defendants seek to reinstate their RICO and ORICO claims based upon the recent United States Supreme Court decisions in *Sedima, S.P.R.L. v. ImrexCo, Inc.,* — U.S. ——, 105 S.Ct. 3292, 87 L.Ed.2d 361 (1985) and *American National Bank and Trust Company of Chicago v. Haroco, Inc.,* — U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), which hold that a RICO plaintiff need not prove a prior conviction of a RICO violation or a "racketeering injury" distinct from an injury from the predicate acts themselves.

Plaintiff objects to reinstating the RICO and ORICO claims on the grounds that a corporate defendant cannot be both the defendant and the enterprise in a RICO action as held by the Ninth Circuit Court of Appeals in *Rae v. Union Bank,* 725 F.2d 478 (9th Cir.1984).

The court finds that defendants have failed to state an adequate claim in that they have not identified an "enterprise" as required under the language of 18 U.S.C. § 1962 separate from the plaintiff. The decisions of the Supreme Court in *Sedima* and *Haroco* fail to address this requirement set out by the Ninth Circuit Court of Appeals in *Rae.*

IT IS ORDERED that:

1. Defendants' motion to amend the pretrial order is DENIED.

2. Defendants' motion to reconsider the court's ruling of July 10, 1985 is DENIED.