**C.E. CARLSON, INC. and Charles E. Carlson, Petitioners,**

**v.**

**SECURITIES EXCHANGE COMMISSION, Respondent.**

**No. 86–2637.**

United States Court of Appeals, Tenth Circuit.

June 10, 1988.

Opinion on Denial of Rehearing Nov. 7, 1988.

Richard F. Thurston, Denver, Colo., for petitioners.

Ruth E. Eisenberg, Sr. Sp. Atty., Securities and Exchange Commission (SEC), Washington, D.C. (Paul Gonson, Sol., Washington, D.C., Daniel L. Goelzer, Gen. Counsel, Benjamin Greenspoon, Associate Gen. Counsel, Robert H. Rosenblum, Atty., SEC, Washington, D.C., with her on the brief), for respondent.

Before MCKAY and BALDOCK, Circuit Judges, and O'CONNOR, District Judge.*

BALDOCK, Circuit Judge.

Petitioner C.E. Carlson, Inc., is a registered securities broker-dealer, and petitioner Charles E. Carlson, is a registered broker and president of C.E. Carlson, Inc. The Securities and Exchange Commission (SEC) imposed sanctions on petitioners based on their activities in closing a public offering of common stock. Petitioners were unable to sell the minimum number of shares required by the prospectus to close the offering. They then attempted to avoid the failure of the offering by purchasing the remaining shares for Mr. Carlson and two limited partnerships which he controlled. The SEC determined that petitioners had violated certain antifraud provisions of the federal securities laws.[1] The SEC upheld the decision of the administrative law judge (ALJ) imposing: 1) a two-month suspension of Carlson, Inc.'s broker-dealer registration, 2) an eight-month suspension of Mr. Carlson's association with any broker or dealer, and 3) a twelve-month prohibition on Carlson, Inc.'s or Mr. Carlson's participation in any securities offering. The sanctions were stayed pending this appeal.

In December 1981, Carlson, Inc. was the managing underwriter for a public offering of 30 million shares of Saratoga Mines, Inc. (Saratoga). Saratoga had been formed earlier that year for the exploration, development and processing of minerals, primarily gold and silver. The offering was on a best efforts, part-or-none basis.[2] Carlson Inc. was to receive a ten-percent commission ($200,000) if the Saratoga offering was successful. The sale of the ten-cent shares was contingent on the sale of at least 20 million shares by March 23, 1982, with an option by Saratoga or Carlson, Inc. to extend the offering period for an additional ninety days. Proceeds from the offering were to be held in escrow until the requisite number of shares had been sold. If the requisite number of shares were not

* Honorable Earl E. O'Connor, Chief Judge of the United States District for the District of Kansas, sitting by designation.

1. The SEC concluded that Carlson, Inc. and Mr. Carlson had violated § 17(a) of the Securities Act of 1933 (1933 Act), 15 U.S.C. § 77q(a); § 10(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78j(b); Rules 10b–5 and 10b–9, 17 C.F.R. § 240.10b–5 & § 240.10b–9; § 15(c)(2) of the 1934 Act, 15 U.S.C. § 78o(c)(2), and Rule 15(c)(2), 17 C.F.R. § 240.15c2–4.

2. The prospectus provided:
The offering is being made on a best efforts basis by the Underwriter. All proceeds from the sale of the first 20,000,000 shares will be deposited in escrow with the United Bank of Skyline, Denver, Colorado and unless at least 20,000,000 shares are sold and 2,000,000 is deposited into the escrow account within 90 days from the date of this Prospectus (which period may be extended for an additional 90 days upon mutual consent of the Company and the Underwriter) all amounts paid will be returned to purchasers without interest and without deduction. If at least 20,000,000 shares are sold and the proceeds therefrom are deposited into the escrow account within the period set forth above, such proceeds will be released to the Company and the offering will be continued without escrow until the all of the shares being offered are sold or until 180 days from the date of this Prospectus, whichever event first occurs. There can be no assurance that any or all of the shares offered hereby will be sold.
Record vol. II, doc. 1 at 2.

sold within the offering period, the offering would be terminated and the investors' funds would be returned.

Mr. Carlson was an officer and director of Saratoga. He was also the managing partner of three other mining companies, Front Range Royalties, Ltd. (Front Range), Frontenac Mining, Ltd. (Frontenac) and AUCO, all of which had a strong financial interest in the success of the Saratoga offering. Mr. Carlson had a direct ownership interest in Front Range and AUCO and an indirect ownership interest in Frontenac.[3] The prospectus for the offering revealed that a substantial amount of the proceeds would be paid to Front Range for mining and milling equipment ($300,000) and to Frontenac to complete the acquisition of a 26.4% limited partnership interest in Frontenac ($550,000). Saratoga had acquired the physical assets of AUCO; in exchange, AUCO was to receive payment based on Saratoga's production. Moreover, AUCO was the general partner of Saratoga, Ltd., a limited partnership which would own 23% of Saratoga after the offering.

As the prospectus makes clear, stock ownership in Saratoga was not for the risk-averse investor. Before the offering, Saratoga had a negative working capital position; its current liabilities exceeded it current assets by $312,365. The firm was "technically insolvent." The mining properties had no production and the mill had been operational for only three months. The firm had engaged in numerous non-arm's length transactions with related entities and the conflicts of interest between the firm and related parties, such as Mr. Carlson, were manifest. The offering price of the stock was completely arbitrary, unsupported by any recognized criteria of value. These factors were disclosed in the prospectus.

As of March 23, 1982, 20 million shares of Saratoga had not been sold, so the offering was extended for an additional 90 days, until June 22. As of mid-April, approximately 75 percent of the shares had been sold. Although the offering period had been extended into June, Mr. Carlson decided to close the offering in early May. On May 4, he and another representative of his firm contacted members of partnerships affiliated with Saratoga, who purchased 450,000 shares. As of May 4, the offering was 3,145,000 shares short of the minimum amount. An additional 740,000 shares were sold, largely to persons or entities related to Mr. Carlson's associate. That left the offering 2,405,000 shares ($240,500) short of the minimum. Mr. Carlson then arranged for Front Range to purchase 700,000 shares ($70,000) and Frontenac to purchase 1,500,000 shares ($150,000). Mr. Carlson also purchased 205,000 shares ($20,500). These sales were possible because of a series of loans facilitated by Mr. Carlson, his associate and the secretary of Saratoga. A firm controlled by the associate, Triad Investment, Inc., lent $150,000 to Frontenac and $20,000 to Front Range. Two investors lent $50,000 to Front Range and $10,000 to Carlson, Inc. at the request of Saratoga's secretary. Mr. Carlson, in his various capacities, signed short-term promissory notes for these amounts. He then personally borrowed $20,500 from Carlson, Inc. The proceeds from these loans were then used to purchase Saratoga stock.

As planned, the offering closed on May 6. Carlson, Inc. received its $200,000 underwriting commission, Front Range received $328,272 and Frontenac received $250,000. Front Range and Frontenac repaid the loans that enabled them to purchase Saratoga stock. Front Range also lent Saratoga's president, Arden Larson, $25,000.

Of course, these facts are capable of differing interpretations concerning the liability of petitioners. The ALJ, however, found:

Carlson's decision to close the offering on May 6, 1982 instead of June 22 was obviously based on his realization that

3. Mr. Carlson had a 30% interest in Front Range and a 25% interest in AUCO. Front Range was a general partner of Frontenac, owning a 59% interest in Frontenac after the offering.

public investors were no longer interested and the fact that both Saratoga and its president, Larson, were urgently in need of money. Saratoga depleted its financial resources and was at least $180,000 in debt. This included two $15,-000 notes to officers and directors which were due on May 18, 1982, and an obligation to Larson who had not received a salary for six months. In addition, Larson testified that in April 1982 he learned that a $20,000 payment on his home mortgage was due on May 7, 1982 and he asked Carlson for help.

Record vol. II, doc. 8 at 11. These findings form the factual basis of the decisions below holding that petitioners violated federal securities laws by borrowing funds to purchase the minimum number of shares necessary to close the offering and then repaying those loans with proceeds from the offering. This was done to avoid refunding amounts paid by the public investors.

On appeal, petitioners contend that 1) the SEC erred in not specifying which factors about petitioners' transactions were objectionable, 2) petitioners' conduct was not violative of the federal securities laws because a) the prospectus disclosed that shares might be purchased by the issuer and b) the public investors' funds were withdrawn from escrow only after the requisite number of shares had been sold, 3) petitioners' defense of advice of counsel was rejected erroneously, 4) petitioners

were wrongly denied discovery on their selective prosecution defense, which should have prevailed, and 5) the sanctions imposed were excessive. We affirm.

Our review of the SEC's factual findings is limited to determining whether those findings are supported by substantial evidence. 15 U.S.C. § 77i(a) (1933 Act § 9(a)); 15 U.S.C. § 78y(a)(4) (1934 Act § 25(a)(4)); *Edward J. Mawod & Co. v. SEC*, 591 F.2d 588, 593 (10th Cir.1979). Substantial evidence means more than a scintilla. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1939). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* If the evidence is capable of rational interpretation that would favor either side, the SEC's findings will not be overturned on appeal. *Davy v. SEC*, 792 F.2d 1418, 1421 (9th Cir.1986).

Section 17(a) of the 1933 Act prohibits fraudulent conduct in connection with the offer or sale of securities, including the use of any scheme to defraud and the omission of material facts necessary to make statements not misleading. Section 10(b) of the 1934 Act prohibits the use of manipulative or deceptive devices in connection with the purchase or sale of securities. Rule 10b–9(a)(2) [4] prohibits the making of a misrepresentation regarding a part-or-none offering. Rule 10b–5 [5] prohibits fraudulent conduct in connection with securities transac-

---

**4.** 17 C.F.R. § 240.10b–9 provides in pertinent part:

(a) It shall constitute a "manipulative or deceptive device or contrivance," as used in section 10(b) of the Act, for any person, directly or indirectly, in connection with the offer or sale of any security, to make any representation:

....

(2) To the effect that the security is being offered or sold on any other basis whereby all or part of the consideration paid for any such security will be refunded to the purchaser if all or some of the securities are not sold, unless the security is part of an offering or distribution being made on the condition that all or a specified part of the consideration paid for such security will be promptly refunded to the purchaser unless (i) a specified number of units of the security are sold at a specified price within a specified time, and

(ii) the total amount due to the seller is received by him by a specified date.

**5.** 17 C.F.R. § 240.10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to admit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

tions, including the use of any scheme to defraud and the omission of material facts necessary to make statements not misleading.

■ The SEC determined that these provisions had been violated because an underwriter or issuer may not represent that securities are being sold on a part-or-none basis unless the offering is contingent on the refund of subscriber funds if the minimum number of shares at the specified price are not sold by a date certain. Once the part or none representation has been made, it may not be circumvented by transactions primarily designed to create the appearance of a successful offering in order to avoid the refund feature of the offering. *SEC v. Coven*, 581 F.2d 1020, 1028 n. 16 (2d Cir.1978), *cert. denied*, 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979). Rule 10b–5 and Rule 10b–9 both proscribe this type of conduct. *See SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1095 n. 13a (2d Cir.1972); *Richardson v. MacArthur*, 451 F.2d 35, 40 (10th Cir.1971) (noting "broad sweep" of Rule 10b–5). The potential return of investor subscriptions, should the market judge the terms of the offering unsatisfactory and not purchase the minimum number of shares, offers some protection to investors. *SEC v. Blinder, Robinson & Co.*, 542 F.Supp. 468, 476 (D.Colo. 1982), *aff'd*, [1983–1984 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,491 (10th Cir. 1983), *cert. denied*, 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 777 (1985). Some protection is afforded because the offering, if it is to succeed, must attract capital in excess of that paid by each subscriber. *See A.J. White & Co. v. SEC*, 556 F.2d 619, 623 (1st Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977). Failure to sell the minimum number of shares may reflect the market's judgment that the risk is too great (i.e. the potential return is too speculative) or that the valuation placed on the offering by the issuer is too great.

Petitioners quarrel with the SEC's reliance on the cases cited above. They contend that the facts in this case are distinguishable because this case does not involve an underwriter 1) retaining sales pro-

ceeds before the required number of shares are sold, *see SEC v. Manor Nursing Ctrs*, 458 F.2d at 1094–95; *SEC v. Coven*, 581 F.2d at 1022–24, 1028–29, 2) transferring escrow money as an accommodation for a loan used to purchase shares, *see SEC v. Blinder, Robinson & Co.*, 542 F.Supp. at 473, 475, 3) arranging for the escrow bank to loan funds to the underwriter and a public purchaser so as to complete the offering, *see id.*, 4) receiving the underwriter's commission before the required number of shares has been sold, *see id.*, 5) prematurely distributing the proceeds of the offering, *see id.*, or 6) arranging short-term bank loans for nominee purchasers and then reselling the stock after closing the offering, *see A.J. White & Co. v. SEC*, 556 F.2d at 620–23. Petitioners' attempt to distinguish these cases is unavailing. Like this case, the cases cited above involve an improper attempt to make an offering appear successful when the required number of shares have not been sold. The purpose is to defeat the refund of monies paid by subscribers in the event the offering is unsuccessful.

The transactions, when viewed as a whole, leave little doubt concerning their purpose. It is uncontroverted that sales of 2,405,000 shares ($240,500) were necessary before the offering could be closed and the proceeds distributed on May 5. Petitioners obtained short-term loans and arranged for the purchase by related entities of the minimum amount of shares which would close the offering. Once the offering had been closed and the escrow broken, the loans were repaid. When the steps in these transactions are consolidated, it is apparent the funds to purchase these last shares came from the offering itself. The part-or-none condition of the offering appeared satisfied, though not by genuine market transactions. We need not identify which feature of this plan renders it impermissible. Suffice it to say that in combination these steps defeated the part-or-none disclosure in the prospectus.

■ Petitioners next suggest that their conduct was not violative of the federal securities laws because the prospectus dis-

closed that shares might be purchased by the issuer. While the prospectus contained a provision known as a "friends of the company list" or a "directed stock list,"[6] we agree with the ALJ that it does not apply here. These types of provisions are more likely to be operative where the demand for the stock exceeds supply. They allow the issuer to set aside stock for particular investors. Here, the demand for the stock was lukewarm at best, the issuer (Saratoga) never provided the underwriter (C.E. Carlson, Inc.) with such a list,[7] and no stock was set aside.

Moreover, the prospectus claims that such sales would be made only to the extent that they "would not be inconsistent with a public distribution of the Common Stock." The actions of petitioners in this case were plainly inconsistent with a public distribution. Quite simply, the directed stock list provision does not disclose that related entities and a related individual would purchase stock sufficient to close the offering with proceeds from the offering, thereby diluting the efficacy of the part-or-none provision. While the prospectus does disclose that funds from the offering would be paid to Front Range and Frontenac and that a commission would be paid to Carlson, Inc., it does not disclose that the funds from the offering would be used to purchase Saratoga stock. We agree with the implicit finding of the SEC that these omitted facts are material—there is a substantial likelihood that a reasonable person would consider them important information in deciding whether to purchase Saratoga stock because such information could affect the value of the stock. *See TSC Industries v. Northway, Inc.*, 426 U.S. 438, 448, 96 S.Ct. 2126, 2131, 48 L.Ed.2d 757 (1976) (materiality standard for Rule 14a-9, 17 C.F.R. 240.14a-9); *Hassig v. Pearson*, 565 F.2d 644, 650 (10th Cir.1977); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

■ Carlson, Inc. is responsible for the actions of its agents, including Mr. Carlson. *A.J. White & Co.*, 556 F.2d at 624. The SEC thus determined that both petitioners acted with scienter in violating § 17(a)(1)[8] of the 1933 Act and § 10(b) of the 1934 Act, including Rule 10b–5. Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). Proof of scienter may be satisfied by a showing of recklessness, or conduct which falls far short of the standard of ordinary care and which carries a danger of misleading purchasers such that petitioners knew or must have known of its propensity to mislead. *Hackbart v. Holmes*, 675 F.2d 1114, 1117–18 (10th Cir.1982). The SEC found that petitioners were aware of the part-or-none provision, the requirement that two million shares be sold in a manner not inconsistent with a public distribution. Rather wait for additional public sales or return the funds of subscribers, petitioners

---

**6.** The prospectus provided:

Management of the Company may provide the Underwriter with a list of persons who management believes may be interested in purchasing Common Stock in the offering. The Underwriter may sell a portion of the Common Stock to such persons if they reside in a state where the Common Stock can be sold and where the Underwriter can sell the Common Stock. The total number of shares of Common Stock that may be sold to such persons will not exceed 3,000,000 shares. The Underwriter is not obligated to sell any shares to any such person and will do so only to the extent such sales would not be inconsistent with a public distribution of the Common Stock. Officers, directors and affiliates of the Company may be sold some of such shares.

Record vol. II, doc. 1 at 40.

**7.** Petitioners contend that there was no need for management of issuer to provide the underwriter with a directed stock list because Mr. Carlson owned the underwriter and was an officer and director of the issuer. They contend that because Mr. Carlson was also a managing partner of Front Range and Frontenac, he knew which *affiliated entities* were interested in purchasing Saratoga stock, hence there was no need for a directed stock list. Merely because the underwriter and the issuer were related does not mean that the terms of the prospectus can be ignored.

**8.** Scienter is not a required element to establish a violation under § 17(a)(2) & (3) of the 1933 Act. *Aaron v. SEC*, 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980).

arranged for non-public sales to close the offering and then retained the funds. These factual findings are supported by substantial evidence. *See id.* at 1118 (applying "clearly erroneous" standard of review to district court findings concerning recklessness).

Petitioners contend that the public investors' funds were withdrawn from escrow only after the requisite number of shares had been sold, and thus, they are not liable under § 15(c)(2) of the 1934 Act. The SEC determined that Carlson, Inc., aided and abetted by Mr. Carlson, willfully violated § 15(c)(2), 15 U.S.C. § 78*o* (c)(2) and Rule 15c2–4, 17 C.F.R. § 240.15c2–4. Section 15(c)(2) of the 1934 Act prohibits brokers and dealers from engaging in fraudulent, deceptive or manipulative acts or practices in connection with the sale of securities. In this type of offering, Rule 15c2–4 makes it a "fraudulent, deceptive, or manipulative act or practice" for a broker or dealer "to accept any part of the sale price of any security being distributed unless: ... the money or other consideration received is promptly deposited in a separate bank account ... until the appropriate event or contingency has occurred, and then the funds are promptly transmitted or returned to the persons entitled thereto." 17 C.F.R. § 240.15c2–4(b).

■ Here, Carlson, Inc. received funds and then instructed the escrow bank to disburse the funds in accordance with the prospectus as if the appropriate event, the sale of 20 million shares, had occurred in genuine transactions. In actuality, the contingency of sales of less than 20 million shares had occurred, so the investors funds should have been returned. This constitutes a violation of Rule 15c2–4. *SEC v. Blinder, Robinson & Co.*, 542 F.Supp. at 479. There is evidence which indicates that Mr. Carlson was aware of this improper scheme and knowingly participated in it in a substantial way; hence, the SEC's imposition of secondary liability on Mr. Carlson as an aider and abettor is supported. *See Decker v. SEC*, 631 F.2d 1380, 1386–88 (10th Cir.1980); *Edward J. Mawod Co. v. SEC*, 591 F.2d at 596. For example, counsel for the issuer, Mr. Lewis, testified that he was not informed of several relevant facts concerning the closing of the offering. Had he been, he would not have approved the closing.

■ Petitioners sought to establish that they relied on the advice of counsel in closing the offering. The elements of such a defense require a showing of 1) a request for advice of counsel on the legality of a proposed action, 2) full disclosure of the relevant facts to counsel, 3) receipt of advice from counsel that the action to be taken will be legal, and 4) reliance in good faith on counsel's advice. *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 467 (9th Cir.1985); *SEC v. Savoy Industries*, 665 F.2d 1310, 1314 n. 28 (D.C. Cir.1981). We agree with SEC that counsel also must be independent. *Sorrell v. SEC*, 679 F.2d 1323, 1327 (9th Cir.1982); *Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 181–82 (2d Cir.1976), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978).

■ In this case, that means that the relevant advice would have come from counsel for the underwriter, Mr. Ducker. The evidence was controverted concerning the amount of disclosure that Mr. Carlson made to Mr. Ducker. Mr. Carlson testified that he disclosed all aspects of the transactions to Mr. Ducker, including Mr. Carlson's role in arranging the loans and their repayment for Front Range, Frontenac and himself. Mr. Carlson also testified that counsel was informed concerning the shares being purchased by related entities so as to close the offering. Mr. Ducker testified otherwise, and the SEC and the ALJ credited his testimony. Although petitioners have listed contrary inferences which might be supported by the record, we are not at liberty to reweigh the evidence. Suffice it to say that the findings below on this issue concerning lack of full disclosure are supported by substantial evidence in the record. Moreover, this defense is seriously undercut by the findings below that petitioners acted with scienter. *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d at 467; *SEC v. Bonastia*, 614 F.2d 908, 914 (3rd Cir.1980).

Petitioners next contend that they were wrongly denied discovery and a hearing on their selective prosecution defense, which they claim should have prevailed. The SEC affirmed the ALJ's refusal to issue six subpoenas to SEC staff members on the grounds that they were not relevant to the charges against petitioners concerning violations of the antifraud provisions of the federal securities laws. It is well established, however, that laws "may be applied so arbitrarily and unfairly as to amount to a violation of constitutional rights." *Cook v. City of Price, Carbon County, Utah,* 566 F.2d 699, 701 (10th Cir. 1977) (citing *Yick Wo v. Hopkins,* 118 U.S. 356, 374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886)). But "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). To move forward on their selective prosecution theory, petitioners were required to show that 1) they were singled out for enforcement while others who were similarly situated were not, and 2) their selection for enforcement was deliberately based on an unjustifiable consideration, in this case the exercise of first amendment rights to freedom of speech and association. *United States v. Amon,* 669 F.2d 1351, 1355–56 (10th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).

The facts alleged in support of the selective enforcement claim occurred at a New Year's Eve gathering in 1981 attended by a large number of John Birch Society members and their guests. Mr. Carlson testified that he introduced himself to Mr. Fusfeld, who indicated that he was a lawyer in the SEC's enforcement division in Denver. Mr. Carlson told Mr. Fusfeld that the Saratoga offering had been processed through the SEC. Mr. Carlson then testified that he made some offhand political remarks which ended in a brief, but heated, discussion with Mr. Fusfeld.[9] A few days after the Saratoga offering closed, the SEC sought a list of purchasers of the offering and this investigation commenced.

Even assuming that these allegations indicated bias, petitioners were unable to show that others similarly situated were not subjected to enforcement proceedings. On appeal, petitioners contend that this showing is inherent in the lack of precedent with similar facts concerning all-or-none or part-or-none offerings. There are two reasons why this contention will not carry the petitioner's burden of proof on this element. First, we are unable to say that a lack of reported precedent necessarily means that a rule is not being enforced. Compliance may be such that there are few occasions for enforcement, or few decisions may be reported. Second, in this case, we *are* guided by several reported cases concerning enforcement of all-or-none or part-or-none provisions. *See, e.g., A.J. White & Co. v. SEC,* 556 F.2d at 622–23; *SEC v. Manor Nursing Ctrs.,* 458 F.2d at 1089; *SEC v. Blinder Robinson & Co.,* 542 F.Supp. at 475–76. Though the incidental facts in this case differ somewhat from the above cases, the operative facts are the same: closing a contingent offering when an insufficient number of shares have been sold publicly. Petitioners have failed to make a prima facie showing on the first element. While we cannot agree with the SEC that a selective prosecution defense was not relevant, we note that the ALJ refused to issue the subpoenas, concluding they were "unreasonable, excessive in scope, and unduly burdensome," relying on SEC Rules of Practice 14(b)(1). We have carefully considered this issue and agree

---

9. Mr. Carlson testified concerning the nature of the remarks:

> Mr. Carlson: And I seemed to—I don't remember exactly the nature of them, but they had to do with government and maybe my feeling about big bureaucracies and something about Ronald Reagan.
>
> And all of the sudden I found myself in sort of a heated sort of conversation that was much warmer than I had intended to ever get involved in. And I extracted myself and went over to my wife, and she said, "Who is that?" And I said, "An SEC lawyer." That was the substance of my conversation.

Record vol. I, tr. at 582. We note that expressing one's antipathy towards the system is not a guarantee against, or a defense to, prosecution. *Barton v. Malley,* 626 F.2d 151, 155 (10th Cir. 1980).

that petitioners simply did not have enough to proceed on the selective prosecution claim; accordingly, the failure to allow discovery below was not an abuse of discretion. *United States v. Bohrer,* 807 F.2d 159, 161 (10th Cir.1986). Thus, there was no error in rejecting the selective prosecution defense.

■ The final contention on appeal is that the sanctions against petitioners are not justified because 1) petitioners are mainly involved in brokering, not underwriting, 2) Mr. Carlson has been in the brokerage business for over 20 years with only one previous sanction by the National Association of Securities Dealers, Inc. (NASD), and 3) lawyers for the issuer and underwriter saw problems only with the loan transactions insofar as the closing was concerned. By statutory design, the SEC has primary responsibility for imposing sanctions. *Quinn and Co. v. SEC,* 452 F.2d 943, 947 (10th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2059, 32 L.Ed.2d 344 (1972). It is entrusted with considerable discretion and this court will not interfere unless the sanctions are beyond the law, devoid of factual support, or are "so lacking in reasonableness as to constitute an abuse of discretion." *American Power Co. v. SEC,* 329 U.S. 90, 112–13, 115, 67 S.Ct. 133, 145–46, 147, 91 L.Ed. 103 (1946); *Wall Street West, Inc. v. SEC,* 718 F.2d 973, 975 (10th Cir.1983).

The factors cited by petitioners do not convince us that an abuse of discretion occurred. Among other things, the SEC was entitled to consider that petitioners were sanctioned by the NASD for similar misconduct in 1981 in connection with an all-or-none limited partnership offering. Record vol. II, doc. 2. The sanctions were reasonable under the circumstances.

ÁFFIRMED.

## ON PETITION FOR REHEARING

■ On rehearing, petitioners urge us to consider their claims of systematic, disparate treatment and rely on *Blinder, Robinson & Co. v. SEC,* 837 F.2d 1099, 1112–13 (D.C.Cir.1988). In that case, the D.C. Circuit noted at least an appearance that administrative sanctions are disproportionately harsh on "smaller, newer firms" than "on old-line, or at least more established, houses with the 'right sort' of exchange memberships." *Id.* at 1112. Based on the information provided in petitioners' rehearing petition, it does appear that petitioners may be on to something concerning the reasonableness of the sanctions.[1]

The difficulty with our consideration of this issue, however, is that it was not raised below. *See* 15 U.S.C. § 78y(c)(1)[2] (1934 Act § 25(c)); *Stead v. SEC,* 444 F.2d 713, 716 (10th Cir.1971), *cert. denied,* 404 U.S. 1059, 92 S.Ct. 739, 30 L.Ed.2d 746 (1972). Petitioners claim that it was implicit in their claim of selective prosecution and their request for less severe sanctions. We disagree. Petitioners claimed that they were subject to selective prosecution based on an SEC staff member's animosity toward them. They also contended that the sanctions were excessive because 1) the petitioners were mainly involved in brokering, not underwriting, 2) Mr. Carlson had been in the brokerage business for over 20 years with only one previous sanction by the National Association of Securities Dealers, Inc. (NASD), and 3) lawyers for the issuer and underwriter saw problems only with the loan transactions insofar as the closing was concerned. These claims simply are not the same as the systematic, disparate treatment claim now advanced in the petition for rehearing.

Petitioners have not established a "reasonable ground" for failure to pursue this

---

1. Based on the information in the petition for rehearing, we must agree that there are colorable allegations of "troubling systematic variances" between sanctions for NYSE firms and non-NYSE firms which are not adequately addressed by mere reference to the SEC's broad discretion and the truism that sanctions may vary from case to case. *Blinder, Robinson & Co. v. SEC,* 837 F.2d at 1112, 1113 n. 13.

2. 15 U.S.C. § 78y(c)(1) provides:

No objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission, or there was reasonable ground for failure to do so.

issue below. *Lowell H. Listrom & Co. v. SEC*, 803 F.2d 938, 941 (8th Cir.1986). A substantial portion of the information in support of petitioners' argument was available well before the SEC's order imposing sanctions. In exceptional circumstances, a reviewing court may consider issues not presented to an administrative agency if "the obvious result would be a plain miscarriage of justice." *Hormel v. Helvering*, 312 U.S. 552, 556, 558, 61 S.Ct. 719, 721, 722, 85 L.Ed. 1037 (1941). Petitioners suggest that we should consider the issue because it represents a fundamental abuse of the administrative process, it is of constitutional magnitude and consideration by the SEC would have been futile.

We are not persuaded by these arguments. This issue depends somewhat upon resolution of factual matters which the proceedings below could have addressed. Moreover, in fairness to the SEC, petitioners should not be heard to offer this new theory on appeal. *Wilson v. Hodel*, 758 F.2d 1369, 1372–73 (10th Cir.1985). The proceedings below appear regular and petitioners do not explain how the administrative process foreclosed raising this theory. Although constitutional concerns are implicated, such concerns could have been addressed below. Indeed, the selective prosecution claim was addressed in the administrative forums. And although petitioners contend that raising a disparate treatment argument below would have been futile given the SEC's past response, that alone is not a sufficient ground for presuming futility. *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952).

Accordingly, the petition for rehearing is denied.