**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 28 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KEVIN D. KUNZ, KUNZ & CLINE
INVESTMENT MANAGEMENT,
INC.,

Petitioners,

v.

SECURITIES & EXCHANGE
COMMISSION,

Respondent.

No. 02-9514
(Admin. Proc. File No. 3-9960)
(SEC)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, Chief Circuit Judge, **McKAY**, and **HENRY**, Circuit Judges.

Petitioners, Kevin Kunz and Kunz & Cline Investment Management ("Kunz

& Cline"), appeal from an order of the Securities and Exchange Commission ("the

Commission" or "SEC") sustaining disciplinary action taken by the National

Association of Securities Dealers ("NASD").[1]  For the reasons set forth below, we

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1] The NASD is a self-regulatory agency, registered with the Commission as
a securities association under the Securities and Exchange Act of 1934 and
(continued...)

AFFIRM.

## I. Background

### A. VesCor

VesCor was in the business of originating, purchasing, and selling loans secured by real property. VesCor financed its business by selling to the public certain investment products, including Wholesale Accrual Notes ("Accrual Notes"), Wholesale Monthly Income Notes ("Monthly Notes"), and Wholesale Mortgage Loan Participation Interests ("MLP Interests") (collectively, "the VesCor investment products"). Val E. Southwick ("Southwick") was VesCor's President, Chief Executive Officer, Corporate Secretary, Chairman, and the sole member of its Board of Directors. Petitioner Kunz worked for VesCor from August 1994 through December 1994. Prior to 1994, VesCor sold the VesCor investment products without registering them under the Securities Act.

### B. The Nevada Investigation

In early 1994, Nevada began investigating VesCor's activities. Nevada concluded that the Accrual Notes, Monthly Notes, and MLP Interests were "securities." Nevada and VesCor entered into a settlement agreement, requiring VesCor to make rescission offers to current holders of the VesCor investment

[1](...continued)
subject to Commission oversight. *General Bond & Share Co. v. SEC*, 39 F.3d 1451, 1453 (10th Cir. 1994).

products in the state of Nevada.

In conjunction with the rescission offers, VesCor planned to simultaneously offer investors the opportunity to reinvest in the Accrual Notes, Monthly Notes, and MLP Interests. VesCor also decided to send the simultaneous rescission-reinvestment offers to investors in other states. In late 1994, Southwick decided that these transactions should be handled by a broker-dealer registered with the Commission. Accordingly, Southwick encouraged Kunz to leave VesCor to form his own brokerage firm.

C.    The Formation of Kunz & Cline

In December 1994, Kunz left VesCor and formed Kunz & Cline with Jeffrey Cline ("Cline"). Southwick, through VesCor, agreed to furnish the required start-up funds. According to Kunz's testimony, Southwick expected Kunz & Cline to be VesCor's "captured broker." The NASD approved Kunz & Cline's application on December 13, 1994.

D.    The Simultaneous Rescission-Reinvestment Offers

VesCor created six Private Placement Memoranda ("PPMs") to accompany the simultaneous rescission-reinvestment offers, providing two different PPMs for each of the three investment products. VesCor used one set of three for residents of Nevada, and the other set of three for non-Nevada residents.

### 1. *Material not included in the PPMs*

At the time VesCor issued the PPMs, $1.8 million in civil judgments were outstanding against Southwick, stemming from previous business activities. The Nevada PPMs contained five paragraphs concerning Southwick's litigation history,[2] but the non-Nevada PPMs did not disclose this information. Further, none of the PPMs disclosed the relationship between VesCor and Kunz & Cline.[3]

All six PPMs included the same financial statement, which Kunz testified that he saw for the first time in November 1994. According to Kunz's testimony, he was surprised by the sizeable net operating loss that VesCor had accumulated since 1991. Although Kunz questioned Southwick about the losses, he conducted no investigation of the information contained in the financial statements.

The financial statements contained a balance sheet dated September 30, 1994, listing VesCor's assets. Included in the "Assets" information was an entry for "Investments" valued at $12,265,322. The balance sheet indicated that, of this amount, $9,191,509 was attributable to a single asset — 20,000 acres in Cannon

---

[2] The Nevada settlement agreement required this disclosure.

[3] Kunz testified that he relied on VesCor's counsel concerning these omissions. Concerning the relationship between VesCor and Kunz & Cline, Kunz testified that he assumed disclosure was not necessary since VesCor's counsel never raised the issue during the drafting of the PPMs. Regarding Southwick's litigation history, Kunz testified that he did inquire whether disclosure of Southwick's litigation history was legally required and VesCor's counsel informed him that inclusion was not required.

County, Tennessee — acquired in exchange for 750 shares of VesCor stock four days prior to the closing date of the balance sheet. The financial statement also contained a "Statement of Shareholders' Equity" showing that (1) on September 26, 1994, 750 shares of stock were issued for the Tennessee land, with each share valued at $12,177.85; (2) on September 15, 1994, 250 shares of stock were issued "for services," with each share valued at $63.80; and (3) on December 31, 1993, the remaining outstanding shares were valued at $1,250.92 per share. The balance sheet and accompanying notes documented that, without the inclusion of the Tennessee land, VesCor had assets of $5,671,761 and liabilities of $6,454,673, resulting in a negative net worth of $782,912.

Kunz testified that he understood the purpose of the Tennessee land deal to be a "balance sheet enhancement, meaning that [Southwick] would acquire the property for a short period of time to make [the] private placement look good and sellable." Kunz also testified that he sought confirmation from VesCor's counsel that VesCor had proper title to the Tennessee land. VesCor's counsel responded only that a deed was recorded. Kunz conducted no further investigation.[4]

---

[4] Apparently, the Tennessee land was comprised of numerous land grants dating from the 1820's, when the North Carolina legislature issued the grants to encourage westward settlement. In many instances, the land grants had not been converted to actual locations, tax maps, or legal descriptions. Rather, the deed merely referenced land-grant numbers in describing the property and contained no language typical of a contemporary land description.

E. Kunz & Cline's Dealings with Bruce Anderson

In 1994, Kunz met Bruce Anderson ("Anderson") through Southwick. Prior to entering into two consulting agreements with Kunz & Cline[5] in 1994, Anderson had sold VesCor securities to numerous customers. Anderson was not properly registered under NASD rules to offer the VesCor securities for sale.

Since Anderson could not present the simultaneous rescission-reinvestment offers to his clients, Kunz met with Anderson and then personally or by mail furnished Anderson's clients with the PPMs. Approximately eighty of Anderson's clients reinvested their funds in the VesCor investment products. Kunz paid Anderson a "consulting fee" of $88,936. At the NASD hearing, Kunz conceded that this was the same amount Anderson would have received as a commission for sales of the VesCor securities. Specifically, Kunz testified that "[t]he reason we formalized the consulting agreement was to compensate [Anderson] in a manner that would have been consistent with commissions that he would have earned had he been licensed."

---

[5] Originally, Kunz and Anderson had intended that Anderson would register and become a principal of Kunz & Cline. These plans were abandoned after Kunz and Anderson discovered that Anderson could not participate in the VesCor investment product offerings because he was not properly registered in accordance with NASD rules.

F.    The Commission's Decision[6]

On January 16, 2002, the Commission concluded that petitioners had violated Rule 2110 of the NASD's Conduct Rules, finding that petitioners: (1) created offering documents for the sale of securities that contained material misstatements and omissions, (2) failed to comply with the Securities Act of 1933's registration requirements, and (3) compensated a person not properly registered pursuant to NASD requirements, in connection with the sale of securities. The Commission also sustained the sanctions imposed by the NASD. This appeal followed.

---

[6] The Commission reached this conclusion in the posture of reviewing de novo the NASD's earlier findings of violations and sanctions. In 1996, the NASD's District Business Conduct Committee ("DBCC") filed a complaint against petitioners, alleging that petitioners committed the following wrongful conduct: (1) selling securities through PPMs containing material misrepresentations and omissions, in violation of NASD Conduct Rule 2110 and 2120; (2) selling securities that were neither registered pursuant to Section 5 of the Securities Act of 1933, nor exempt from registration, in violation of Section 5 and Conduct Rule 2110; (3) making unsuitable recommendations of VesCor securities in light of customers' financial situations and needs, in violation of Conduct Rules 2310 and 2110; and (4) paying brokerage commissions to Anderson, who was not properly registered under NASD regulations, in violation of Conduct Rule 2110.

On November 3, 1997, the DBCC entered its final decision, finding for complainant on all counts (with the exception of the Conduct Rule 2120 allegation) and imposing sanctions. Petitioners then appealed the DBCC's decision to the National Adjudicatory Council of the NASD ("NAC"). The NAC affirmed on all counts, with the exception of the unsuitable recommendations count, and reduced the fine by $10,000.

## II. Discussion

### A. Standard of Review

"Our review of the SEC's factual findings is limited to determining whether those findings are supported by substantial evidence." *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1433 (10th Cir. 1988) (citations omitted). Although substantial evidence requires more than a "scintilla" of evidentiary support, in general, "[i]f the evidence is capable of rational interpretation that would favor either side, the SEC's findings will not be overturned on appeal." *Id.* (citation omitted). In other words, substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citation omitted). In reviewing the Commission's conclusions of law, our review is de novo. *Lehl v. SEC*, 90 F.3d 1483, 1486 (10th Cir. 1996). We review the sanctions imposed in this case for an abuse of discretion. *C.E. Carlson*, 859 F.2d at 1438.

### B. Whether the Commission Erred in Concluding That Petitioners Violated NASD Rule of Conduct 2110.

Under NASD Rule of Conduct 2110, "[a] member, in conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade." In this case, the Commission concluded that petitioners violated Rule 2110 by (1) creating offering documents for the sale of securities that contained material misstatements and omissions, (2) failing to comply with

- 8 -

the Securities Act of 1933's registration requirements, and (3) compensating Anderson, who was not registered in accordance with NASD requirements, for the sale of securities.  We consider these three findings in turn.

1.    *Material misrepresentations and omissions*

a.    <u>*Overview of applicable law*</u>

In general, "'[a] statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock,' and if it would have 'significantly altered the total mix of information available' to current and potential investors." *City of Philadelphia v. Fleming Co.*, 264 F.3d 1245, 1265 (10th Cir. 2001); *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) ("[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information.").  "Although in general materiality is primarily a factual inquiry, the question of materiality is to be resolved as a matter of law when the information is so obviously important [or unimportant] to an investor, that reasonable minds cannot differ on the question of materiality." *SEC v. Cochran*, 214 F.3d 1261, 1267 (10th Cir. 2000) (internal quotation marks omitted) (citing *Connett v. Justus Enters. of Kan., Inc.*, 68 F.3d 382, 384 (10th Cir. 1995)).

b.    <u>*The Commission's conclusions*</u>

The Commission concluded that petitioners made three material

misrepresentations or omissions. Specifically, the Commission found that: (1) petitioners' statements regarding VesCor's Tennessee land holdings and the financial statements in VesCor's PPMs were material misrepresentations; (2) petitioners' failure to disclose the financial relationship between VesCor and Kunz & Cline in all of the PPMs was a material omission; and (3) petitioners' failure to disclose Southwick's litigation history in the non-Nevada PPMs was a material omission. We consider each finding in turn.

c.       *Misrepresentation regarding the Tennessee land*

We have no doubt that information regarding the Tennessee land would be "material" to an investor, insofar as "'a reasonable investor would consider it important in determining whether to buy or sell [the securities],' and . . . it would have 'significantly altered the total mix of information available' to current and potential investors." *Fleming*, 264 F.3d at 1265 (citation omitted). As the Ninth Circuit has stated, "[s]urely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge." *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) (citing cases). Even if, as petitioners maintain, holders did not acquire an "ownership" interest in VesCor, they were still "creditors of the company," and as such, VesCor's financial condition was highly relevant to their decision to purchase the VesCor investment products. Further, the Commission appears correct in its conclusion that both the Accrual

Notes and the Monthly Notes were secured, to some extent, by VesCor's assets. Comm. Order at 9. Specifically, the PPMs defined the investors' security as follows: "Note holders . . . will be creditors of the company to be secured by a partial assignment of the company's interest in a trust account at a financial institution and/or in certain first trust deeds."

Petitioners stress that an independent auditor had inspected the financial statements. However, petitioners' awareness of numerous "red flags" warranted further investigation. First, the Tennessee land had a *substantial* effect on VesCor's balance sheet. As the Commission found, "[w]ith it, VesCor appeared to have a positive net worth of approximately $8 million, when in reality the company had a negative net worth of approximately $800,000." Comm. Order at 9. Second, the amount and valuation of the stock exchanged for the Tennessee land should also have raised questions. "The PPMs indicated that VesCor acquired [the Tennessee land] in exchange for stock that was valued on a per share basis at approximately *200 times* the value assigned just weeks earlier in another transaction involving the issuance of stock for services, and approximately 10 times the value assigned to shares owned by Southwick, the only other shareholder."[7] Comm. Order at 11 (emphasis added). Third, VesCor

---

[7] The financial statements noted that, on September 26, 1994, VesCor issued 750 shares of stock for the Tennessee land, with each share valued at

(continued...)

acquired the Tennessee land only four days prior to the balance sheet's closing date. Fourth, Kunz was aware of VesCor's dubious intention with respect to the Tennessee land deal. Kunz testified that he understood the purpose of the Tennessee land deal to be a "balance sheet enhancement, meaning that [Southwick] would acquire the property for a short period of time to make [the] private placement look good and sellable."

Despite these red flags, Kunz conducted no investigation of the Tennessee land asset, other than to ask VesCor's counsel whether VesCor had proper title to the Tennessee land. Thus, substantial evidence supports the Commission's finding of a material misstatement with respect to the information provided in the PPMs concerning the Tennessee land asset.

  d.  *Omissions regarding (1) the financial relationship between VesCor and Kunz & Cline in all of the PPMs and (2) Southwick's litigation history in the non-Nevada PPMs*

The fact that Kunz & Cline might be operating under a conflict of interest, due to its relationship with VesCor, would no doubt be important to any of VesCor's offerees in their decision to purchase VesCor investment products. *See*

_____

[7](...continued)
$12,177.85. Only eleven days earlier, on September 15, 1994, VesCor had issued 250 shares of stock "for services," with each share valued at $63.80.

- 12 -

*Fleming*, 264 F.3d at 1265. The same goes for Southwick's litigation history, insofar as Southwick was VesCor's "alter ego."[8]

Petitioners do not seriously dispute this, but point to their reliance on the advice of VesCor's counsel. However, VesCor's counsel cannot be properly characterized as disinterested. *See C.E. Carlson*, 859 F.3d at 1436 (citing cases). Accordingly, petitioners' reliance on the advice of VesCor's counsel cannot excuse their omission of material facts from the PPMs.

### 2.  *Sale of non-registered, non-exempt securities*

There is no dispute that the VesCor securities at issue were not registered. Rather, petitioners contend that the VesCor investment products were exempt from the registration requirements of sections 4 and 5 of the Securities Act, 15 U.S.C. §§ 77d & 77e, under either (1) "Regulation D," 17 C.F.R. § 230.506, or (2) the Securities Act of 1933 § 4(2), 15 U.S.C. § 77d(2).[9] We reject both contentions.

### a.  *Regulation D*

Under Regulation D, 17 C.F.R. § 230.506, certain "limited offers" are exempt from registration. Section D's exemption is not available, however,

---

[8] Southwick was VesCor's President, Chief Executive Officer, Corporate Secretary, Chairman, and the sole member of its Board of Directors.

[9] Although petitioners do not reassert this argument on appeal, we briefly review the Commission's findings under section 4(2).

where there are "more than 35 [non-accredited] purchasers of securities from the issuer in any offering."  17 C.F.R. § 230.506(b)(2)(i)-(ii).  As sellers of unregistered securities, petitioners had the burden of proving entitlement to exemption.  *Andrews v. Blue*, 489 F.2d 367, 374 (10th Cir. 1973).

In this case, the Commission found that 138 non-accredited investors purchased Accrual Notes, Monthly Notes, and MLP Interests.  Comm. Order at 14.  Thus, if the VesCor investment products are "integrated," Regulation D's exemption would clearly be inapplicable.[10]  The Commission concluded that the Accrual Notes, Monthly Notes, and MLP Interests were one "integrated" offering, and substantial evidence supports this conclusion.[11]

First, the three rescission-reinvestment offerings were made simultaneously.  Second, the VesCor investment products were all offered for the same general purpose.  The PPMs make this purpose clear:

The Company intends to provide general funding for the operations

---

[10] The Commission alternatively noted that VesCor had 58 non-accredited investors in Accrual Notes and 45 non-accredited investors in Monthly Notes, taking both offerings outside Regulation D's ambit even in the absence of integration.

[11] In reaching this conclusion, the Commission applied a five-factor test, set forth in SEC Rule 502(a).  Comm. Order at 14.  These factors include: (1) whether the offerings are part of a single plan of financing; (2) whether the offerings involve issuance of the same class of securities; (3) whether the offerings have been made at or about the same time; (4) whether the same type of consideration is received; and (5) whether the offerings are made for the same general purpose.

of the Company's expansion activities with respect to a series of mortgages made or purchased at a discount. The source of such funds would be the proceeds from the sale of [the particular securities] and the sale of [the two other securities] pursuant to other simultaneous private offering memoranda.

Third, as the Commission noted, "the consideration for the securities was the same: the rejection of the right to rescind a prior investment and the election to credit accumulated interest to principal . . . [and for any] new or additional investment . . . the consideration was cash." Comm. Order at 15.

Based on the above, we conclude that substantial evidence supported the Commission's conclusion rejecting VesCor's argument under Regulation D.

b.      *Section 4(2) of the Securities Act*

Section 4(2) of the Securities Act of 1933 exempts from registration "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(2). Again, petitioners had the burden of proof. *Andrews*, 489 F.2d at 374.

In determining whether an offering is "public," we have previously construed section 4(2) as providing for exemption from "registration only when an offeree has had sufficient access to information similar to that made available to the offeree in a registration statement." *Id.* at 373. Thus, "the exemption question turns on the *knowledge* of the offerees." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953) (emphasis added). In other words, "an offering is private when made 'to those who are shown to be able to fend for themselves.'" *Andrews*,

489 F.2d at 373 (citing *Ralston Purina,* 346 U.S. at 124).

In conducting this analysis several factors are relevant, including: "(1) the number of offerees, (2) the sophistication of the offerees, (3) the size and manner of the offering, and (4) the relationship of the offerees to the issuer." *Murphy*, 626 F.2d at 644-45 (internal citations omitted).

Petitioners point to no evidence in the record concerning the actual number of offerees, or the offerees' particular characteristics. "That failure by itself may be fatal to [petitioners'] claimed exemption under § 4(2)." *Mark v. FSC Securities Corp.*, 870 F.2d 331, 334 (6th Cir. 1989). Further, petitioners made offerings to a large number of diverse investors. Finally, petitioners point to no evidence of a relationship between VesCor and the numerous offerees.

Based on the above, we conclude that substantial evidence supported the Commissioner's determination that VesCor's offering of its investment products was not exempt from registration under section 4(2) of the Securities Act of 1933.

3. *Compensation to Anderson, a non-registered broker, for the solicitation or sale of securities*

Petitioners do not dispute that Anderson was not properly registered under NASD regulations. Rather, petitioners attack the Commission's conclusion regarding the connection between Kunz & Cline's compensation to Anderson and the sale of VesCor securities to Anderson's clients.

In his testimony before the NASD, Kunz admitted that "[t]he reason we formalized the consulting agreement was to compensate [Anderson] in a manner that would have been consistent with commissions that he would have earned had he been licensed." In addition, Kunz acknowledged that the actual amounts paid to Anderson were consistent with the amounts that would be paid as commissions for sales of VesCor securities. Further, several VesCor investment product purchasers indicated that Anderson sold them the securities during the period in question. In fact, Anderson notarized several of the purchase agreements, indicating that the agreements were executed in his presence. Thus, there was substantial evidence supporting the Commission's conclusion that Kunz & Cline's payments to Anderson were compensation for the sale of securities.

C.    Whether the Commission Erred in Upholding the Sanction Imposed.

We review the sanction in this case for an abuse of discretion. *C.E. Carlson,* 859 F.2d at 1438. In this case, the NASD: (1) suspended Kunz from associating with any NASD member firm in a representative capacity for thirty calendar days and in a principal capacity for one year, to run concurrently; (2) required Kunz to requalify as a representative within ninety days of the conclusion of his suspension as a representative or cease to function in that capacity until he requalified, and to requalify as a principal before functioning in such a capacity; (3) ordered Kunz & Cline to retain an independent consultant; (4)

fined Kunz and Kunz & Cline $20,000, jointly and severally; (5) fined Kunz $5,000, individually; and (6) imposed hearing costs on Kunz and Kunz & Cline, jointly and severally. The Commission upheld the NASD's actions, concluding they were not "excessive, oppressive or an undue burden on competition," and further noting the sanctions fell within the applicable range under the NASD's sanction guidelines.[12] Comm. Order at 19. We cannot conclude that this constituted an abuse of discretion.

### III. Conclusion

Based on the foregoing, we AFFIRM.

ENTERED FOR THE COURT,

Deanell Reece Tacha
Chief Circuit Judge

---

[12] *See* NASD Sanction Guidelines.